# Richmond.

ANNA L. HENTZ, ET ALS. v. VICTORIA B. STEVENS WALLACE'S ADM'R, ET ALS.

November 14, 1929.

Absent, Chichester, J.

438

The opinion states the case.

*C. O'Conor Goolrick, McGuire, Riely & Eggleston* and *Marion A. Wright*, for the appellants.

(No appearance for the appellees.)

PER CURIAM.

The issue here is one of *devisavit vel non.* Mrs. Victoria B. Stevens Wallace died on December 14, 1927, testate, and her will is now before us on petition for appeal, and has been attacked upon the ground of mental incapacity.

Mrs. Wallace, *nee* Stevens, was the child of a second marriage. Her father died when she was quite young and her mother when she was sixteen years old. She married Judge A. W. Wallace, of Fredericksburg, in April, 1883. Her will, which was a formal document, was executed April 29, 1886, and duly witnessed. Afterwards, on May 29, 1886, the testatrix added this codicil:

"Codicil to my Will.

"As a codicil to my will I desire to modify the remainder as to 3258 Chestnut street, Philadelphia, left to the Diocesan Missionary Society of Virginia, so as to direct the trustee, C. W. Wallace, to pay the net income of the property mentioned as left to said society, to the Bishop of the Episcopal Church of the Diocese of Virginia, relying on his integrity that the Diocesan Mission shall have the benefit of said income.

"VICTORIA B. STEVENS WALLACE."

In June, 1886, she went with her husband to Europe, and while there, when in York, England, on August 31, 1886, wrote in pencil on a sheet of tourist paper the codicil on which this case turns. It is:

"I make this codicil to my will on this 31st day of August, 1886; and directing by this paper that should my husband, A. Wellington Wallace, die before me, the rest and residue of my estate of which I may die seized shall be divided into two parts, one part to go to the devisees of my said husband or his heirs at law; and the other half to be divided into two parts; one to go to Mrs. Robert G. Newbold and her issue, and the other part to go to the devisees or heirs of my said husband. Dated York, England.

"(Signed) VICTORIA B. S. WALLACE.

"I changed the word 'directed' to 'directing' in the 4th line.

"(Signed) V. B. S. W.

"In case the foregoing codicil goes into effect I appoint the Girard Life Insurance Annuity and Trust Company Executor of my will.

"(Signed) VICTORIA B. S. WALLACE."

This, contestants say, is invalid because of want of testamentary capacity. On May 12, 1890, on motion of her husband, she was adjudged insane and he was

appointed her committee. This insanity, then determined, continued uninterruptedly until her death in December, 1927. Judge Wallace died in October, 1927.

As a young girl she attended a fashionable school in Philadelphia. She there appears to have been quiet, courteous, dignified and reserved, had few intimate friends and took relatively little interest in school activities. Moody at times, there was nothing to suggest an unbalanced mind.

The first definite abnormal manifestations came while her mother was dying. She stood before a mirror combing her hair when told that she was *in extremis* and wished to see her. This request went unheeded and she continued her toilet and to hum some tune.

After her mother's death she established for herself a home in Philadelphia befitting her wealth and station, and continued to live there until her marriage.

Her letters cover about one hundred pages of the record, and run from July, 1882, to January, 1889. Most of them are addressed to Judge Wallace and to her uncle, and make interesting reading. So far from being the products of a diseased mind, they manifest discriminating intelligence. Few women write as well.

From early girlhood until marriage and afterwards she seems to have been more than usually attractive. She dressed with neatness, elegance and taste, and conducted herself as might have been expected of one normal and well bred. It is entirely true that she took small interest, as a young woman and later, in social gaieties, but was always quiet, reserved and had few, if any, intimate friends. In the summer of 1884 she went to Hot Springs and remained there for three or four weeks. A gardener there has testified that it was her habit on occasions to walk much by herself. She would at times sit in an attitude of dejection, and her

appearance was described as sad. After her marriage and before 1886, one witness thought she presented the same unhappy mien when on the streets of Fredericksburg.

Her relations with Mr. and Mrs. Alexander Leavett, her half sister, were not cordial, and upon her return from Europe she told her cousin that she had met them over there, but said: "I did not speak to them." While in Paris, in November, 1886, she was seen by Mr. Alexander Leavett, who thought her appearance was far from natural. She held down her head, played with trimmings on her dress, seemed depressed and worried, and entirely indifferent to things around her.

In February, 1887, when at a hotel in San Remo, Italy, with her husband, it was her habit to remain in her room during the morning hours, coming down after luncheon to spend some time on the veranda. During this entire time, she was accompanied by a nurse or woman companion, who looked after her, placed wraps about her and performed other acts of attention. She took no interest in the ordinary diversions, seemed depressed and took no sight-seeing trips. On this occasion an earthquake occurred. She acted in a childlike manner and directed her attendant or companion to remain in a particular spot while she helped children out of the building.

In January, 1889, she was placed under the care of a physician in Philadelphia, and then entertained the mistaken impression that she was pregnant. A few months later she was placed under the care of Dr. S. Weir Mitchell, a noted nerve and brain specialist, and was treated in one of his private homes. She had to be fed forcibly, was generally resistive, and would not perform her bodily functions. At the request of Dr. Mitchell she was examined by Dr. Hirst, of the Uni-

versity of Pennsylvania, who thought that she was undoubtedly insane, and as we have seen she was thereafter so adjudged.

Her mother's sister was insane, and was admitted to an institution for the care of such unfortunates on August 1, 1894.

Mrs. Roberta G. Newbold, a first cousin and beneficiary under the second codicil, who testified as a witness for the proponents, said that Mrs. Wallace talked with her about making a will. Her evidence, in part, is:

"There was no question in the case Judge Wallace survived her. She just put it, would it be right to leave all her property to him in case he survived her. I said: 'Yes, that is what my will said, that I had left unquestionably all to Mr. Newbold in case he survived me.' And then she said if he did not survive her, did I think it would be right to divide it and give one-half to Judge Wallace's family and one-half to her family. I said: 'Yes, I thought it would be fair.' "

This is, in substance, the contestants' case, as set out in their petition for appeal and in a hypothetical question propounded to Dr. Beverly R. Tucker, an expert on brain and nervous diseases.

 Taking all of this evidence at its face value, it does not show that decedent was unbalanced when the codicil of August, 1886, was written, and nothing tends to show the slightest abnormality except her strange conduct at the death of her mother and the fact that she at times seemed to be dispirited and dejected, coupled with the further fact that she was intimate with no one and was reserved in manner.

For the proponents, these facts are proven by many witnesses. After her marriage and the bridal trip to Europe, she and her husband established themselves

in a home at Fredericksburg. Her life there until the second trip to Europe in 1886 was wholly uneventful. She went about as other women do, presided in her home, received her friends, shopped around the town, and did those things which ordinarily might have been expected of her. She was interested in her church, was a member of a reading class, took her friends riding on occasions and among the many people that she met there was no suggestion of an unbalanced mind, and it was not until 1888 that neighbors took note of anything unusual. One witness said that she then at times seemed to be "wool-gathering."

As late as 1887 she was in conference with the Girard Trust Company's officials about her business. Mr. Morris, who was then vice-president, was asked if Judge Wallace were not really the one who attended to her affairs. He answered: "It was her estate; it was an estate in which she was interested, and I recall that she was alert and asked questions about it."

There is in the record a letter to that company written in 1887, which deals with business matters in a perfectly lucid way. It is true that Dr. Tucker thought it might have been dictated by her husband. That is surmise and certainly it was written by her. From 1875 to 1889 she drew checks which were in evidence, amounting to something over $141,000.00, of which $42,000.00 covers items after marriage. A number of these checks were drawn when she was in Europe in 1886. They are drawn on three banks, two in Philadelphia and one in Fredericksburg. They cover repairs to property, tax payments, contributions to charity, household expenses, an allowance made by her to a dependent relative, and indeed almost every imaginable subject. There are over 800 of them. Checkbook stubs were also in evidence. They show balances on

hand and deductions for drafts thereon. In 1887 she bought bank stock. She ordered credit to be transferred from a Philadelphia bank to Fredericksburg. During all of these transactions there was no suggestion that she was not entirely competent. Judge Wallace appears to have been a thoughtful and devoted husband. Her relations with her own people were not particularly intimate, and while they were disappointed over the contents of her will, we see nothing in this lack of cordiality towards them so inherently abnormal as to suggest any want of necessary capacity to dispose of her estate as seemed to her desirable.

The testatrix by this codicil materially changed the provisions of her will so as to prevent the lapse of the legacy to her husband in case he predeceased her. She had the right so to change it. It was her property. Courts do not make wills for people, they make them for themselves.

█ A careful examination of all the evidence, and it covers hundreds of pages, discloses no fact which would have justified the trial court in submitting the question of her sanity in August, 1886, to a jury. Had that been done and had the jury seen fit to hold with the contestants, it would have amounted to a permit to them to write a new will. Any verdict setting aside the will should in turn have been set aside by the trial court, and so there was no error in withdrawing from the jury *in limine* all evidence for the contestants, which is what was done.

█ There are a number of assignments of error. It is said that "the lower court erred in refusing to grant the motion of contestants that the judge of the lower court recognizes the summons served upon him and testify as a witness at the trial of said cause, and,

to that end, decline to preside at the trial of said cause and take the necessary steps to have another judge preside at the trial thereof."

It appears that Judge Wallace, in 1924, filed with Commissioner F. W. Coleman (now judge) a petition to perpetuate the testimony of witnesses adduced in respect to the sanity of his wife, between 1883 and the end of 1889. It was natural that he should have done so. The estate was large and his wife was then insane. Certain requirements of the statute in the taking of this testimony were not observed and this attempt to perpetuate testimony failed. These facts, if proven, could not have changed the results.

It is next said that the court erred in accepting eight veniremen named in the exception. The reasons relied upon to establish their incompetency are not serious. Their integrity is not questioned and no jury could have properly returned any verdict differing from that given after contestants' evidence had been withdrawn from their consideration.

It is said that Mr. Leavett should have been permitted to testify to a conversation which he had with Judge Wallace in Paris, in November, 1886, and that this reply of the witness would have appeared had he testified:

"I asked him how she was getting on, and he replied shaking his head: 'Not very well. I brought her over to Europe to consult an alienist.' "

In *Hopkins* v. *Wampler*, 108 Va. 705, 62 S. E. 926, 928, this court said: "It is competent to prove the treatment of the testatrix by the family, but not their opinions of her mental condition. Wigmore on Evidence section 1621, citing *Foster* v. *Brooks*, 6 Ga. 290, where it is said: 'Hazardous in the extreme would it be to the rights of parties under the law, if they were

allowed to depend upon the opinion of a neighborhood of the sanity of individuals. Hearsay evidence is excluded because a witness ought to be subjected to cross-examination, that being a test of truth. It ought to appear what were his powers of perception, his opportunities of observation, his attentiveness in observing, the strength of his recollection and his disposition to speak the truth". See also *State* v. *Coley*, 114 N. C. 879, 19 S. E. 705.

This exception is not well taken. Had the testimony been admitted, it could not have changed the result.

It is next said that a witness should have been permitted to answer this question: "You mention what Judge Wallace said to you in 1889. Did he tell you that he had taken her to consult any —" It is further said that if the witness had been allowed to answer she would have testified that Judge Wallace told her before 1889 he had consulted alienists about Mrs. Wallace's condition.

We have already seen that she manifested, during 1888, evidences of mental deterioration, but we are dealing with what took place in 1886 and not in 1888 or 1889. Insanity when once established is presumed to have continued, but there is no presumption of such status at a period antedating that on which it is established.

Mr. George W. Leavett was asked:

"Q. During the course of that European trip, did Mrs. Newbold make any statement to you relative to the sanity or competency of Mrs. Wallace?

"A. Yes.

"Q. What was the substance of it and where was it made?"

Any answer·which he might have made would have been, for reasons heretofore stated, plainly incompetent.

An objection is made to the introduction of evidence as evidence-in-chief, after the contestants had closed their case.

The order of introduction of testimony is a matter resting in the sound judicial discretion of the court. When the proponents had shown the due execution of the will, they might have rested, and, after the contestants had introduced all of their evidence, brought out in rebuttal anything pertinent tending to show the sanity of the testatrix.

It is next said that the court erred in striking out all evidence for the contestants. If that evidence was not sufficient to support a verdict, and we think it was not, there was no error here. *Davis* v. *Rogers*, 139 Va. 618, 124 S. E. 408.

For a like reason, there was no error in rejecting all of the instructions tendered on behalf of the contestants.

We think that the decree appealed from should be sustained as being plainly right, from which it follows that the appeal and supersedeas should be denied, and this is done.

*Appeal denied.*