167 So.2d 154

**W. T. SMITH LUMBER CO.,**

v.

**L. J. FOSHEE et al.**

**4 Div. 189.**

Supreme Court of Alabama.

Aug. 27, 1964.

Alton L. Turner, Luverne, for appellant.

Jas. M. Prestwood, Andalusia, for appellees.

HARWOOD, Justice.

On March 22, 1945, Mrs. Ella Lavon Foshee executed a deed conveying to the W. T. Smith Lumber Company, a Corporation, 200 acres of timber land situated in Covington County, Alabama. The purchase price was $5,000.

On April 18, 1961, the complainants filed a bill in equity seeking cancellation of the deed on the ground of the alleged insanity of Mrs. Foshee at the time she executed the deed.

After hearing, the Chancellor took the matter under consideration and thereafter entered a decree finding, among other things, that Mrs. Foshee was insane at the time of the execution of the deed, that W. T. Smith Lumber Company had notice of such insanity, and ordered that the deed be cancelled and held for naught.

Counsel for appellee has confined his brief to a critique of appellant's brief. Appellee counsel complain that the assignments argued by appellant contain no reference to the page in the record where they may be found, that the assignments are general in nature, and that appellant's brief contains no condensed recital of the evidence in narrative form.

The assignments argued by appellant go to the insufficiency of the evidence to support the court's findings that Mrs. Foshee was of unsound mind and that respondent had notice of such condition on Mrs. Foshee's part.

Several of appellant's assignments of error raise the sufficiency of the evidence to support the decree in the above aspects. These assignments are in due form. A large volume of the evidence presented below was directed toward the issue of Mrs. Foshee's mental condition. It would be most difficult and impractical to refer by page number to this great mass of evidence. The decree is a unit, and if erroneous in any respect the error permeates the entire decree and an assignment in general terms is sufficient. Murphy v. Pickle, 264 Ala. 362, 87 So.2d 844.

Counsel for appellant has divided his recitation of the facts as they pertain to these separate factual situations, that is, the narrative of the witnesses' testimony is not set out in a continuous fashion. On the whole, all of the evidence appears to be set forth in the above manner. While not technically conforming to the rules per-

taining to the form of briefs, there is a substantial compliance and to a degree that it would be hypertechnical to reject appellant's brief. Further, counsel for appellee had not pointed out wherein any of the substantial facts are omitted from appellant's narrative presentation.

In the hearing below the evidence introduced by the complainants as to Mrs. Foshee's mental condition, consisted of four documentary exhibits, and the testimony of L. J. Foshee, and Mary Ella Foshee, a son and a daughter of Ella Lavon Foshee.

Complainant's exhibit 1 was a certified copy of the deed executed by Mrs. Foshee as above mentioned.

Complainant's exhibit 2 was a certified copy of a decree of the Probate Court of Conecuh County, Alabama, entered on 20 August 1948, adjudging Mrs. Foshee to be of unsound mind on that date.

Complainant's exhibit 3 was a certified copy of a petition filed in the Probate Court of Conecuh County on 1 August 1959, contesting the last will and testament of Mrs. Foshee, on the ground that Mrs. Foshee was mentally incompetent to make and execute a will on 1 December 1947.

Complainant's exhibit 4 is a certified copy of a decree of the Circuit Court of Conecuh County, entered on 18 November 1960, adjudging that an instrument executed by Mrs. Foshee dated 1 December 1947, was not a genuine last will and testament.

L. J. Foshee, a son of Ella Lavon Foshee, and one of the complainants herein, testified that in March 1945 he was living at Cohassett in Conecuh County. His mother lived in a house about one hundred or one hundred fifty yards away. One of her daughters, Mary Ella Foshee, lived with her.

In 1941 another of Mrs. Foshee's sons was killed in China while flying as a member of General Chennault's Flying Tigers group. Thereafter, Mrs. Foshee seemed to withdraw from her family. Before this tragedy she would discuss business transactions with the witness, but afterwards she did not. The witness knew nothing of her sale of the two hundred acres to the W. T. Smith Lumber Company.

On 20 August 1948, his mother, Mrs. Foshee, was adjudged to be of unsound mind and she was committed to Bryce Hospital where she remained until her death some ten years later.

The witness further testified that he would go to his mother's house on occasions and would drop by to see how she was getting along, but she did not have anything to do with him.

We excerpt the following from Mr. Foshee's cross examination:

"Q Now I believe in your bill of complaint here you allege that at the time of the conveyance that you did not know that your mother was of such unsound mind as to be capable of making a conveyance, is that correct? At the time she made this deed you didn't know she was of such unsound mind as to make this deed?

"A That's right."

Mr. Foshee further testified that his mother maintained a bank account during this period of time and wrote checks, and attended to her own funds. She operated her home together with his sister's help.

Mr. Foshee testified that in March 1945, he saw someone go to his mother's home but did not know who it was, and when he asked her who it was she said it was a hearing aid man.

At no time in his testimony did Mr. Foshee express any opinion as to his mother's sanity as of the date of the deed.

Upon the calling of Miss Mary Ella Foshee as a witness, the attorney for the complainants stated, "If the court please, the witness is a meningitis victim and we are going to ask some indulgence and leniency in examining her." Thereafter, on direct examination, many of the questions

propounded to this witness were quite leading in character. This witness was not cross examined.

Mary Ella Foshee testified that after the death of her brother in China, her other brothers and sisters stopped visiting as Mrs. Foshee showed signs of not wanting to see them, and one time called them her enemies. She remembered that some men came by three or four times to talk with her mother about buying the land and timber. Her mother would send her out of the room during these times. On one occasion, however, she heard one of these men say to another that they had better grab the land at that price before Mrs. Foshee knew the value of the land, and on another occasion she overheard one man say to the other, "Let's take her up on it because the value of the land would be that much." Miss Foshee at no time identified these men in her testimony.

This witness further testified that on occasions her mother would tell her that if she told anybody about her private business what she would do. One time when the witness was in the kitchen, her mother grabbed a rake and tried to hit her with it and she backed off. Her mother would also occasionally tell her that she would kill her, "If you do such and such a thing."

The record shows the following during this witness's cross examination:

"Q   When these men, and I am referring to exhibit 1, when these men came by there to talk about buying this land from your mother, in your opinion, Miss Foshee, was your mother of sound mind at that time?

"A   In my opinion she was not."

We now consider the admissibility of the documentary evidence above mentioned.

■ The decree entered in the sanity inquisition should not have been considered by the court below and cannot be considered by us, being incompetent and immaterial evidence. Section 372, Title 7, Code of Alabama 1940. As stated in Todd v. Ward, 201 Ala. 205, 77 So. 731:

"The fact that, on inquisition in the probate court, Todd was found to be of unsound mind approximately three months after the transaction was consummated was without legitimate influence upon the issues tendered and contested in this cause; it being a purely ex parte proceeding and had subsequent to the creation of the rights of contract brought under consideration by this bill. Frederic v. Wilkins, 182 Ala. 343, 62 South. 518."

And in Frederic v. Wilkins, 182 Ala. 343, 62 So. 518, the court held that the record of lunacy proceedings by which a grantor was committed to the insane asylum several years before he made the deed was properly rejected as res inter alios acta, and being ex parte was not binding upon the grantor.

By the same reasoning, the decree of the Probate Court finding that Mrs. Foshee was mentally incompetent to execute a will on 1 December 1947, some two years and nine months after the execution of the deed, should be rejected as res inter alios acta. The W. T. Smith Lumber Company was not privy to the will contest. Further, the remoteness of this adjudication in relation to the date of the deed negatives any probative value. The decree was not evidence of Mrs. Foshee's mental condition at any time prior to the execution of the will, but by its terms was limited solely to the day on which the will was executed. Possessing no real probative value, this evidence should be rejected.

In Hentz v. Wallace's Adm'r, 153 Va. 437, 150 S.E. 389, the Virginia court held that there is no presumption of insanity antedating the time at which it is adjudicated.

In McGregor v. Keun, 330 Ill. 106, 161 N.E. 99, the Illinois court held that an adjudication of mental incapacity raised no presumption of incapacity to make a deed a year and a half prior to the adjudication.

To the same effect is Rowan v. Hodges, Tex.Civ.App., 175 S.W. 847, and Rhoades v. Fuller, 139 Mo. 179, 40 S.W. 760, wherein it was held that a record of a sanity inquest held only twenty days after the making of a deed was inadmissible, the court observing:

"It is no uncommon occurrence for persons who have never manifested any evidence of insanity to become violently insane within a very short space of time. Neither party claimed under the proceedings in the probate court, and whether Rhoades was sane or insane at that time could in no wise affect defendant's rights."

In considering the testimonial evidence as to Mrs. Foshee's mental condition, we repeat that Mr. L. J. Foshee expressed no opinion as to his mother's mental condition as of the date of the deed.

The sole remaining testimonial evidence presented by complainants directed toward this issue is the testimony of Mary Ella Foshee. Her testimony must be considered in the face of the averments of the bill, she being one of the complainants and also one of the children of Mrs. Foshee.

In paragraph 5 of the bill it is averred, among other things, "That during the course of this estrangement she" (Mrs. Foshee) "ceased to confide in any of her children or associate with them as she had done prior to her insanity and although this complainant was aware of the change which had come over his mother he was not acquainted with the extent of her illness *nor were the other children who are complainants * * *.*" (Italics ours.) Mary Ella Foshee was one of the children and one of the complainants.

Again in paragraph 6 the complaint avers, "That the decedent's children did not know she was planning to convey the property *and did not know at the time of the conveyance that she was of such unsound mind as to be incapable of making a conveyance.*" (Italics ours.)

It cannot be gainsaid but that these averments are material in that they tend to avoid laches on the part of the complainants, a matter pleaded in respondent's answer.

The effect of the averments are that the complainants and children of Mrs. Foshee did not know that she was of unsound mind at the time of the execution of the deed. Contradictory of these averments is the testimony of Miss Foshee.

■ To authorize relief in equity the allegations and proof must correspond, and no matter how just the demand established by complainant's proof, if it does not harmonize with the allegations of the bill, the complainant is not entitled to relief. This is fundamental and essential to the due administration of justice in preventing surprise and depriving parties of their rights without due process of law. Williams v. State, 215 Ala. 546, 112 So. 114.

■ These rules as to variance have been strictly followed by this court and a variance between a material allegation and the proof is fatal to any relief on final decree. Birmingham Securities Co. v. Southern University, 173 Ala. 116, 55 So. 240; Helmetag v. Frank, 61 Ala. 67.

■ Thus the variance between the allegata and the probata as adduced by Miss Foshee's testimony being fatal to any relief sought, and the documentary evidence being incompetent and immaterial, no basis exists for the court's finding that Mrs. Foshee was of unsound mind on the date she executed the deed, and such finding was erroneous.

Further, we are clear to the conclusion that there is no evidence in this record tending to establish that the W. T. Smith Lumber Company, its agents or employees, had notice of such insanity.

Clearly the testimony of Mr. McGowin and Mr. Hinson was to the effect that there was nothing in Mrs. Foshee's conduct in their dealings with her that would so indicate, but on the contrary their testimony was to the effect that Mrs. Foshee carried on the business of the sale of the land in

a competent manner. Further, and reinforcing the testimony of Mr. McGowin and Mr. Hinson, is the testimony of L. J. Foshee, a son of Mrs. Foshee and complainant in the suit below, to the effect that at the time the deed was executed by Mrs. Foshee in 1945 he himself was unaware that his mother was of unsound mind. Certainly if this witness was unaware of such condition in his mother, it cannot be rationally concluded that Mr. McGowin and Mr. Hinson should have perceived any unsoundness of mind in their casual and infrequent contacts with her.

As before stated, the court decreed cancellation of the deed, and further ordered that the $5,000 purchase price, together with interest thereon at 6% from the date of its payment, and the taxes paid by the W. T. Smith Lumber Company, as found to be due by the register, be recovered by the lumber company.

Even had Mrs. Foshee been of unsound mind on the date of the deed, the absence of knowledge by the respondent would bring this suit within the influence of Section 41, Title 9, Code of Alabama 1940. This section provides:

> "Whenever any person shall in good faith, and for a valuable consideration, purchase real estate from an insane person, without notice of such insanity, such contract and conveyance shall not be void, but such insane person may recover from the vendee or those claiming under him, the difference between the market value of such real estate at the time of the sale and the price paid therefor, with interest thereon, and shall have a lien on such real estate to secure the same, and the purchasers from such vendee, without notice of the insanity of the original vendor, shall be protected in like manner and have the benefits of this section."

As pointed out in Ward v. Stallworth, 243 Ala. 651, 11 So.2d 374, to get title by deed from a non compos mentis, the purchaser must buy in good faith, for a valuable consideration, without notice of the insanity. This was the situation in this case. The respondent was therefore entitled to possession of the land, for its deed was not void. Even had Mrs. Foshee been incompetent on the day the deed was executed, the remedy of her privies, the complainants here, could have been only to recover the difference between the market price of the land and the price actually paid.

The only two witnesses testifying for the complainants in this regard were Mr. L. J. Foshee and Mr. Ralph Powell. On cross examination, Mr. Foshee testified first that he did not know how much timber was on the 200 acres of land at the time it was sold and that he did not propose to be a timber estimator. Later he testified that, "Oh, there was a couple of million feet, I'd say." Clearly little probative value can be accorded Mr. Foshee's testimony as to the amount of timber on the land in view of the equivocal nature of his testimony.

As to the value of the timber in 1945, Mr. Foshee testified at this time timber was bringing a good price, probably $40 to $50 per thousand feet stumpage, but then testified as follows:

> "Q  Stumpage was selling at from $40 to $50 a thousand?
>
> "A  I didn't say it was selling for that. I said it was worth that.
>
> "Q  You know what the market was at that time?
>
> "A  No, I don't know what the market was.
>
> "Q  That's what I was trying to find out.
>
> "A  Well, why didn't you ask?"

Thus by his own testimony Mr. Foshee demonstrated he did not know the market value of standing timber in 1945. The value of the timber was of course a substantial component of the value of the land.

Mr. Ralph Powell testified that he had been a land surveyor and timber cruiser for

some twenty to thirty years. He testified that he was familiar with the tract of land in question and was familiar with it in 1945. He had not cruised the timber in 1945, but he drove through it several times. He was in the military service in 1945, stationed in Tennessee but had come home some fifteen times during that year. He went to Evergreen several times on these visits home and went down a road through the land in question, and he also had been on the land hunting squirrels. Based on driving along this road and on going onto the land while hunting, Mr. Powell stated that in his opinion there was a million feet of timber on the land which should have been worth $35,000 in 1945. He further testified that the value of the land, separate from the timber was not less than $40 an acre.

Mr. Powell could not remember buying any timber land in 1945, and stated he would have to go downstairs and consult the record as to the sale of any timber lands by him in 1945.

Mr. Powell further testified that as far as he could recall the tract of land in question had never been in cultivation, but that most of the land was in timber.

The uncontradicted evidence shows that the OPA ceiling price on manufactured pine timber in 1945 was from $30 to $35 per thousand feet. It would appear that this uncontradicted evidence as to the value of manufactured pine timber would cast serious doubt upon the probative value of the testimony of Mr. L. J. Foshee and Mr. Powell as to the stumpage value of pine timber in 1945.

Relative to the value of timber, and of timber land in 1945, Mr. R. H. Foshee, a banker in Red Level, Alabama, for about 49 years, testified that in 1945 his bank sold 240 acres of timber land to Mr. S. T. Kerwin which land was within a mile or two of the Foshee tract. This timber land was sold for $10 per acre.

A few months later this tract of land was bought by the W. T. Smith Lumber Company for $3,900 after a cruise of the timber showed that there was 325,000 feet of pine and 129,000 feet of hardwood.

Mr. Albert Patrick who has been in the saw mill business from 1936 to 1951, approximately seven to ten miles from Cohassett, testified as to his purchase of timber in 1945. Mr. Patrick testified as to a number of specified purchases he made during the years 1943, 1944, and 1945. These sales reflect the purchase price of roughly $10 per thousand feet or less.

Charles Dixon another qualified lumberman testified that in 1945 the market price on pine timber was $5 to $10 per thousand feet, and that he paid mostly $10 to $12 per acre for timber land during that year. There was no appreciable difference from the timber land he bought from the general type of timber land in the Cohassett community. In 1948 he bought 3,980 acres at public auction located about 15 miles from Cohassett for $18 per acre for the land, timber, houses, and the equipment on it.

Frank Sellers, a lumberman of 30 to 40 years experience, testified that the pine timber market in 1945 was from $8 to $14 per thousand, and that there was little if any market for hardwood at that time.

Mr. J. D. Brown who had worked as a timber cruiser for the W. T. Smith Lumber Company for thirty years, testified that he cruised the timber on the Foshee land in 1943 and from such cruise estimated there was 268,000 feet of pine timber and 155,000 feet of hardwood on the tract. He knew of various other sales of timber lands bought by the W. T. Smith Lumber Company during 1945 and the price paid to Mrs. Foshee for her land, based upon the amount of timber on the land, was one of the highest prices paid by the respondent for timber land in 1945.

Julian McGowin, testified that he had participated in buying about 60,000 acres of land for the respondent. The market value of pine timber during the year 1945 was approximately $10 per thousand. Every tract of land purchased by the W. T. Smith

Lumber Company in 1945 was primarily valuable for growing timber and this was true of the Foshee land.

Mr. McGowin further testified that there was no difference in the value of timber land in.Butler County and Covington County in 1945. The market was stable and the prices were generally uniform throughout southeast Alabama. The price paid Mrs. Foshee was a price that would meet any competition.

It is thus apparent that the evidence offered by the respondent as to the market value of timber, and of timber land, is so overwhelming in its probative value when compared with the evidence presented by the complainants in this regard that even had the lower court drawn its decree in compliance with Section 41, Title 9, supra, the evidence would have compelled a finding that a reasonable market value had been paid by the respondent to Mrs. Foshee as the purchase price of the land in question.

Reversed and remanded.

LIVINGSTON, C. J., and SIMPSON and MERRILL, JJ., concur.