243 So.2d 361

**W. T. SMITH LUMBER CO., a Corp., et al.**

v.

**Horace FOSHEE et al.**

**4 Div. 313.**

Supreme Court of Alabama.

Nov. 5, 1970.

Rehearing Denied Feb. 4, 1971.

Thomas S. Lawson, Jr., Montgomery, for appellants, Steiner, Crum & Baker, Montgomery, Turner & King, Luverne, of counsel.

James M. Prestwood, Andalusia, for appellees.

COLEMAN, Justice

This is the second appeal in this cause. See W. T. Smith Lumber Co. v. Foshee, 277 Ala. 71, 167 So.2d 154.

The suit is in equity to cancel a deed executed in March, 1945, by Ella Lavon Foshee, a widow, whereby, for Five Thousand Dollars, she conveyed two hundred acres of timber land to respondent, W. T. Smith Lumber Co., a Corporation, sometimes herein referred to as Smith.

The grantor died in 1959. The complainants are the administrator of the grantor and her next of kin, i. e., her descendants. In 1961 complainants commenced this suit in which they contend that the grantor was of unsound mind and lacked mental capacity to execute the deed at the time she signed and delivered it. In their amended bill, complainants allege:

"That the respondent's agents, servants or employees who negotiated the sale for the above described realty did not do so in good faith or they could have observed and did observe, at the time of the negotiations, that the decedent was insane and therefore unable to enter into the sale or conveyance of her property.

. . . . " In their bill of complaint, complainants also allege:

". . . . That the decedent's children except Mary Ella Foshee did not know she was planning to convey the property and did not know at the time of the conveyance that she was of such unsound mind as to be incapable of making a conveyance. . . . ." On the first trial, the court found as follows:

". . . . the court finds that on March 22, 1945, that Ella Lavon Foshee was insane, and that the respondent, W. T. Smith Lumber Co., had notice of such insanity, and that the deed executed to the respondent, W. T. Smith Lumber Co., should be cancelled and set aside."

On first appeal, supra, this court reversed for reasons stated as follows:

"Thus the variance between the allegata and the probata as adduced by Miss Foshee's testimony being fatal to any relief sought, and the documentary evidence being incompetent and immaterial, no basis exists for the court's finding that Mrs. Foshee was of unsound mind on the date she executed the deed, and such finding was erroneous.

"Further, we are clear to the conclusion that there is no evidence in this record tending to establish that the W. T. Smith Lumber Company, its agents or employees, had notice of such insanity." (277 Ala. at 75, 167 So.2d at 158)

After remandment, certain successors in interest under Smith were permitted to intervene. The court heard testimony ore tenus. Much of the testimony taken on the first trial was offered in evidence. Additional testimony was taken and the cause was submitted for decree.

The trial court again found that the grantor was not mentally competent to execute the deed to Smith in 1945, and that Smith had notice of the grantor's incompetency. The court ordered the deed canceled and Smith divested of title, and that complainants pay to respondents $5,000.00.

Two issues were considered by this court on first appeal, to wit:

1. Does the evidence support a finding that the grantor did not have sufficient mental capacity to execute a valid deed on March 22, 1945, when she signed and delivered the deed to Smith?

2. If the evidence does support a finding that she did not have sufficient mental capacity to execute a valid deed, then does the evidence support a finding that Smith had notice of her lack of such capacity? The same issues are presented on the instant appeal.

We will consider the first issue. The evidence bearing on the issue of grantor's mental capacity, or which was offered at the first trial as bearing thereon, is discussed at some length in the opinion on first appeal and will not be again recited in detail here.

It appears that in the summer of 1948, the grantor was admitted as a patient to Bryce Hospital, which is an institution maintained by the state for the care and treatment of the insane. The grantor remained in Bryce Hospital until her death in 1959. At the second trial, complainants offered the deposition of Dr. J. S. Tarwater, who was serving as supervisor of Bryce Department of Schools and Director of the State Department of Mental Health at the time of his deposition. Counsel for respondents stipulated and agreed that Dr. Tarwater is eminently qualified "to give the testimony he is about to give, and an expert witness in this case." Dr. Tarwater's deposition was not offered at the first trial. His deposition is the only new testimony offered at the second trial which tends to support complainants' contentions that the grantor lacked mental capacity to execute the deed and that Smith had notice of grantor's lack of such capacity.

Dr. Tarwater testified that the grantor was admitted to Bryce Hospital July 29,

1948. It is the practice there to bring a newly admitted patient before the staff for evaluation or diagnosis. The grantor was brought before the staff according to the practice. Dr. Tarwater was present as were seven additional doctors. After questioning the grantor, the doctors made a diagnosis. On some occasions the doctors differ in their opinions.

In the grantor's case, the doctors almost completely agreed. One doctor did not vote. The majority opinion was " . . . . paranoid condition with superimposed manic episodes." Five of the seven agreed with that. "The sixth one agreed with the paranoid condition, which is an *in-set stage*, but did not say superimposed—on the manuscript—so that will be the difference in the total vote."

Dr. Tarwater proposed the first diagnosis, to wit: " 'It appeared that something happened to her in 1936 that brought about a different change. She now appears to be in a manic state. I will vote the paranoid condition superimposed by manic episodes.' "

Doctors Leach, Well, Beal, and Lawrence agreed with Dr. Tarwater. Doctors Byrd and Dardon voted for paranoid condition. Dr. Payne did not vote.

Dr. Tarwater testified that the diagnosis, paranoid condition or paranoid state, " . . . . is—given to a person who is mentally ill with a certain picture for mental illness. That picture consists of what we call paranoid feelings and ideas directed toward people. In other words they are hostile. They have ideas which they express about what is happening to them as a result of other people, in their minds and body, and working against them. And that's about the usual picture of the paranoid state, or paranoid condition. And, of course, the opinions of the ideas that they have are based—they are actually delusions, unnatural thinking, in that their thinking is not based on fact."

Dr. Tarwater defined the manic state as " . . . . a state of hyper-activity, extreme talking, everything in an over-stimulated condition. Moods are over-stimulated; activity; frequently also hostile. And, just a general state of over-stimulation as contrasted with what we call a manic depressive side, when the individual is abnormally sad, and not normally stimulated by—" In the witness' opinion, a person suffering from this mental illness would not be capable of conducting business.

The witness continued. In evaluating the person's condition, it is very helpful to have the life situation. From discussions with the grantor and information obtained from her relatives, " . . . . we were able to get a pretty good picture of . . . ." grantor's "abnormal condition, beginning very soon after her husband's death." The grantor answered a good many questions indicating her extreme hostility toward her children, about how they were endeavoring to take over everything and all working against her. She mentioned a thirty-year-old young man that was her friend " . . . . and they were trying to break her friendship uo with this young man . . . ." She stated she was sixty-nine. When asked how long it had been since the boys turned against her, she answered " 'ever since their dad died, in June 1936.' " She said she never had any trouble with them until the death of her husband. The doctors felt a "beginning change" occurred in the grantor after her husband died in 1936.

In her first interview, the grantor mentioned that her two sons had recently had "peace warrants" sworn out against them. She said they wanted to get what she had and she had "battled them" ever since her husband died to keep them from getting everything. They wanted to keep anybody else from getting it. When asked who else might get part of her estate, she said, "Anybody I wanted to give it to.' "

The grantor remained continuously in the hospital from 1948 until her death in 1959. She was never sent home or considered for a trial visit because she never improved sufficiently. Her illness, when

she was admitted was permanent. A paranoid state in some patients will improve, the majority will not.

The doctor testified further that, except for certain types of admissions such as for a lunacy commission under "Title 45," ". . . . we do not make any attempt to try to determine when the trouble actually began." ". . . . we made no attempt to—other than information she gave us to set a certain day of beginning. Now, frankly, I do not know much of the condition of Mrs. Foshee prior to her husband's death, but we do know, or feel that we do know, that there was a change beginning after his death and that information is based on what Mrs. Foshee tells us, plus similar information that the family tells us, so, on that basis we did feel that, certainly, abnormal changes took place in Mrs. Foshee after the death of her husband."

When the witness first evaluated her condition, he did not consider it irreversible "But, as it turned out it was irreversible." It is the witness' opinion that in 1936, and subsequent years until her death, she suffered from a paranoid condition, and during that period the illness seriously impaired her business judgment.

On cross-examination, the witness testified as follows:

"Q Doctor, is that paranoid condition, does it come on to a full extent, all at once, or is it a progressive sort of thing, after it starts?

"A Progressive."

In the beginning stages, the illness is not as serious as it is later. The beginning stage starts with suspicion. The individual has a feeling of insecurity, is rather cautious, somewhat withdrawn, begins to suspect everybody. Later the paranoid's thinking, delusions, become crystallized usually on certain ones and then it's pretty well fixed. Some cases, after treatment, are able to throw out their former suspicions.

In the grantor's case, the witness did not make any effort at any time to determine exactly when "this on-set began, other than generally, something happened in 1936 to create a change"; it was not his purpose, upon her admission, to determine when it began.

The witness testified that this paranoid condition is usually characterized by extreme "cunningness"; that paranoids generally are "pretty smart people"; in a lot of cases they are able to conceal their condition from those that are close to them. With the manic episodes they become just the opposite, they talk freely. ". . . . you gentlemen could go up and talk to— this afternoon—and talking about a general subject, you would not detect anything."

The witness believes that in the manic state you would detect something because they, the paranoids, bring into the conversation the principal things they are concerned with such as being held in the hospital and who's working against them.[1]

Manic episodes come and go. The grantor could have gone three or four days or longer without having a manic episode. Paranoids, as a rule, are cunning. The witness testified:

"Q Doctor, you testified that in your opinion her business judgment was impaired from the on-set in 1936.

---

[1]. The witness testified:
"Q Well, is it—would it be unusual, —I will put it this way. Would it be unusual for a person to have a conversation with a person who is afflicted with the paranoid state and not be able to really realize it?
"A Yes. That's true. That you gentlemen could go up and talk to—this afternoon—and taking about a general subject, you would not detect anything.
"Q And less, even, with the manic stage that you mentioned, a lay person could misinterpret.
"A I believe you would in the manic stage, because they were—bring into the conversation the principal things they were concerned with, such as being held in the hospital, why they're here, who's working against them, and all that."

"A Yes.

"Q Could you say that during that entire peiod (sic) of time that she would not be aware of the subsequence of an action in dealing with business?

"A I think she would not have paid particular attention to the subsequence of her act. It wouldn't have mattered much to her.

"Q But, she would have known what they were?

"A Well, she might have known what they were, but if knowing and not caring it seems to me about the same thing.";

and also:

"Q Doctor, I have covered this in some respect, but I wanted to get it clear in the record. If a stranger had approached Mrs. Foshee on a business matter, when she was not in a manic episode, would they have considerable difficulty in determining, a lay person, in determining that there was anything wrong with her mentally?

"A From any knowledge of her, I would say that they could have certainly detected a lack of judgment.

"Q That was during the time she was in the hospital?

"A Before.";

and also:

"Q One final question, two final questions. If I understand you correctly, you stated to Mr. Turner, based on your knowledge of her as a patient over a 10 year period, and on a clinical study of the case history, that a layman talking with her during this long period of mental illness, would have no difficulty in seeing that there was something wrong with her judgement?

"A Yes."

As stated by this court on the first appeal with respect to the testimony of Mary Ella Foshee, a daughter of grantor, who testified as to statements made by the men who came to talk with her mother, "Miss Foshee at no time identified these men in her testimony." It follows that the testimony of the daughter has no probative force to show that Smith had notice of the grantor's lack of mental capacity.

As also noted on the first appeal, L. J. Foshee, a son of grantor, testified that in March, 1945, he was living in Conecuh County and his mother lived in a house about one hundred fifty yards from the son. He testified that at the time his mother made the deed, he did not know that she was of such unsound mind as to be incapable of making the deed, and he never did express an opinion as to her sanity at the date of the deed.[2] During this period of time, his mother maintained a bank account and attended to her own funds. His testimony on the first trial was introduced in evidence on the second trial.

The burden of proof is upon the party attacking a conveyance to show the alleged incapacity of the grantor at the very time of the transaction. Hall v. Britton, 216 Ala. 265, 113 So. 238; Halman v. Bullard, 261 Ala. 115, 73 So.2d 351; Hardee v. Hardee, 265 Ala. 669, 93 So.2d 127.

Likewise, the burden is on the party attacking the conveyance to show that the grantee had notice of the incapacity of the grantor. Hughes v. Dempsey, 209 Ala. 375, 96 So. 435; Title 9, § 41, Code 1940.

The testimony of Dr. Tarwater, in our opinion, is sufficient to support the trial

2. L. J. Foshee testified:
"Q Now I believe in your bill of complaint here you allege that at the time of the conveyance that you did not know that your mother was of such unsound mind as to be capable [sic] of making a conveyance, is that correct? At the time she made this deed you didn't know she was of such unsound mind to make this deed?
"A That's right."

court's finding that, at the time of execution, the grantor lacked mental capacity to execute the deed; and, with respect to that finding the decree is affirmed.

On the second issue, in our opinion, the evidence compels the opposite result. In the amended bill, as quoted above, complainants allege that Smith's agents who negotiated the sale ". . . . could have observed and *did observe* . . . . that the decedent was insane and therefore unable to enter into the sale or conveyance of her property." (Emphasis Supplied)

The most that complainants have proved is by Dr. Tarwater's testimony that Smith's agent who dealt with the grantor ". . . . could have certainly detected a lack of judgement" and ". . . . would have no difficulty in seeing that there was something wrong with her judgement."

This falls short of proving complainants' averment that Smith's agents not only could but *did observe* that the grantor was insane and therefore unable to convey her property. Dr. Tarwater also testified that you gentlemen could go up and talk to a person afflicted with the paranoid state this afternoon and, talking about a general subject, *you would not detect anything.*

Dr. Tarwater's testimony is merely to effect that it would have been or was possible for Smith's agents to have detected a lack of judgment. The witness does not say

that Smith's agents would or even probably would have observed the grantor's lack of judgment. In the absence of some evidence indicating that Smith's agents did or probably did observe the grantor's lack of judgment, the mere possibility that they could have done so is not sufficient, especially so in view of complainants' averment that grantor's children, except Mary Ella Foshee, ". . . . did not know at the time of the conveyance that she was of such unsound mind as to be incapable of making a conveyance," and the testimony of her son, L. J. Foshee, who was then living within one hundred fifty yards of his mother, that he did not know at the time she made this deed that she was of such unsound mind as to be incapable of making the deed. If the son, who had greater opportunity to observe the grantor's incapacity than Smith's agents had to do so, did not know of her incapacity, proof merely that it was possible for Smith's agents to have detected her lack of judgment is not in our view sufficient to sustain the finding that Smith is chargeable with notice of the grantor's insanity.[3]

Under the evidence, the grantee purchased in good faith and for a valuable consideration. For lack of evidence proving that the grantee had notice of the grantor's insanity, the decree is reversed. The cause is remanded to the trial court for further proceedings under Title 9, § 41, Code 1940,[4] to determine whether the market value of

---

3. ". . . . Further, and reinforcing the testimony of Mr. McGowin and Mr. Hinson, is the testimony of L. J. Foshee, a son of Mrs. Foshee and complainant in the suit below, to the effect that at the time the deed was executed by Mrs. Foshee in 1945 he himself was unaware that his mother was of unsound mind. Certainly if this witness was unaware of such condition in his mother, it cannot be rationally concluded that Mr. McGowin and Mr. Hinson should have perceived any unsoundness of mind in their casual and infrequent contacts with her." (277 Ala. at 76, 167 So.2d at 158)

4. § 41, Title 9, recites:
"Whenever any person shall in good faith, and for a valuable consideration, purchase real estate from an insane person, without notice of such insanity, such contract and conveyance shall not be void, but such insane person may recover from the vendee or those claiming under him, the difference between the market value of such real estate at the time of the sale and the price paid therefor, with interest thereon, and shall have a lien on such real estate to secure the same, and the purchasers from such vendee, without notice of the insanity of the original vendor, shall be protected in like manner and have the benefits of this section."

the land exceeded the purchase price, and the amount of the excess, if any.

Reversed and remanded.

SIMPSON, HARWOOD, BLOOD-WORTH and McCALL, JJ., concur.