47 So.2d 191

### HUFFSTUTLER v. EDGE.

4 Div. 132.

Court of Appeals of Alabama.

Nov. 29, 1949.

Rehearing Denied April 25, 1950.

Crews Johnston, of Clayton, for appellee.

Clayton & LeMaistre, of Eufaula, for appellant.

J. Terry Huffstutler, pro se.

CARR, Judge.

This is an action for malicious prosecution. In the court below the trial judge, without the aid of a jury, rendered judgment for the plaintiff in the sum of $750.00.

The question of prime concern on this appeal revolves around the inquiry of whether or not the evidence is of sufficient potency to sustain this judgment.

In approaching our task we must, of course, adhere to the familiar rules relating to our review of cases tried below without a jury. Halle v. Brooks, 209 Ala. 486, 96 So. 341; Hackett v. Cash, 196 Ala. 403, 72 So. 52; Norris v. Kelly, 249 Ala. 281, 31 So.2d 129.

In the case at bar, the plaintiff below, as an independent contractor, entered into an agreement with General Ore Company to mine some bauxite ore in Barbour County, Alabama. The defendant below was the president and owner of the ore company. The appellee owned part of the machinery equipment which he used in the mining operations.

Apparently the undertaking did not prove to be profitable to the appellee, and after several months of operation he became heavily indebted to various supply merchants in that vicinity.

According to the testimony of the appellant he agreed with the appellee to pay these accounts in the course of time as the funds of the ore company would permit. In consideration of this promise the appellee agreed to transfer title to his part of equipment to the General Ore Company. The accounts were paid by appellant.

The appellee denied in his testimony that he agreed to sell or transfer title in his property to the ore company.

This evidential conflict comprises the prime factual dispute disclosed by the record.

The operations continued to be unprofitable to the appellee and finally he abandoned the enterprise and moved the machinery, which without dispute he originally owned, to Anniston, Alabama. The appellant testified that this was done without his knowledge or consent.

Upon learning of the location of the equipment, the appellant went to Anniston and swore out a warrant against the appellee charging him with grand larceny of the property. He later appeared and testified before the grand jury in Calhoun County. No indictment was returned. Two months later, however, the grand jury in Calhoun County did return an indictment charging the appellee with grand larceny and embezzlement of the equipment in question. This case was subsequently nol prossed.

After the proceedings in Calhoun County had terminated as indicated, the appellant contacted the solicitor in Barbour County, Alabama. The solicitor testified that the appellant talked to him and his deputy several times about the matter and the possibility of a successful grand jury investigation. The witness stated also that the appellant was very solicitous about the investigation of the case and appeared very much interested in the prosecution.

In response to subpoenas the appellant and other witnesses appeared and testified before the grand jury in Barbour County. The appellant was the only one among the number who gave evidence which related in any manner to the alleged claim of ownership of the equipment which was the subject of the controversy.

The grand jury of Barbour County returned an indictment against the appellee charging him with grand larceny of the property in question. The indictee was later acquitted of the charge.

This is only a scant delineation of the tendencies of the evidence, but it is suffi-

cient as a basis for our review. There was other evidence which tended to support the judgment of the trial judge.

This suit is based on the proceedings in Barbour County.

"Malicious prosecution is the putting of the processes of law in operation maliciously and without probable cause, leading on in due course to the arrest of the victim." Morgan v. Baird, 219 Ala. 225, 121 So. 526, 527.

"An action for malicious prosecution may be maintained against a person who procures an indictment and carries on a prosecution against another, other elements of the cause of action being present, whether or not he appears of record to be the prosecutor." 34 Am.Jur., p. 715, Sec. 22.

In the case of King v. Second Nat. Bank & Trust Co. of Saginaw, Mich. et al., 234 Ala. 106, 173 So. 498, 500, Justice Bouldin writing for the Supreme Court said:

"It is the law that one who, shielding himself behind a grand jury investigation, corruptly or oppressively brings about the indictment and prosecution of another maliciously and without probable cause, is no less guilty than if he had sworn out a warrant in the first instance. This may be accomplished by fraud, perjury, subornation, or by the willful suppression of known material facts, the intentional thwarting of a fair investigation."

It clearly appears to us that the issues of malice and want of probable cause were issues of fact which were addressed to the court in the instant case. In our view this judgment should not be disturbed.

The case at bar in many factual aspects is analogous to the case of Morgan v. Baird, supra. By logical deduction we find much support in this opinion for our conclusions here.

One assignment of error poses the position that the amount of the judgment was excessive. This is not sufficiently stressed in brief of counsel. Republic Iron & Steel Co. v. Quinton, 194 Ala. 126, 69 So. 604; Western Union Tel. Co. v. Benson, 159 Ala. 254, 48 So. 712; Powell v. Bingham, 29 Ala.App. 248, 196 So. 154.

The remaining assignments of error are based on the trial court's rulings on the evidence. We do not find any prejudicial error in this connection. Some of the questions, the objections to which were overruled by the court, related to inquiries that were in no manner in dispute. Stallings v. State, 249 Ala. 1, 32 So.2d 233; Wilson v. State, 31 Ala.App. 21, 11 So.2d 563.

It is insisted in brief of counsel that there were certain parts of a documentary exhibit which were not properly contained in the instrument. These were merely cumulative of other evidence that was not in dispute. This aside, the objections were interposed to the exhibit as a whole. Morgan v. Baird, supra.

It is urged that a witness was permitted, over timely objections of appellant, to state his conclusions. If we should agree with this position, a reversal of the judgment would not be authorized. The witness, without objections, stated facts sufficiently detailed to base his conclusions. Haas Bros. v. Craft, 9 Ala.App. 404, 64 So. 163.

We do not find any prejudicial error in this record. The judgment of the lower court is therefore ordered affirmed.

Affirmed.

### On Rehearing.

It is earnestly insisted that in our original opinion we did not set out the evidence in sufficient detail to insure full review by the Supreme Court on petition for certiorari. We do not hesitate to make further delineation of the evidence. However we pretermit any reference to much of the testimony which in our view is not in any manner pertinent to the issues involved in the case. We refer particularly to the proceedings in the bankrupt court which occurred subsequently to the return of the indictment on which the case at bar is predicated.

In part the appellee testified:

"Q. You were in business in Eufaula. Now go ahead and give the history of this operation in Barbour County. A. The operation started as soon as we could move the drier from Eufuala to the mine, and we operated several months on that basis and were losing money.

"Q. Did you make any other arrangements? A. I went to Mr. Huffstutler and talked with him and he agreed to discontinue the rental on the equipment, 50¢ a ton rental of his equipment, and he would just own it himself from thereon out, but at that time I was behind with some accounts.

"Q. What kind of accounts were they? A. Accounts for gas and oil.

"Q. You mean local accounts? A. Local accounts.

"Q. Running accounts you might say? A. Yes, sir. It amounted to about $3300, and I told Huffstutler that I would have to try to make some arrangements about paying that if I continued to operate at all, and he agreed to take care of that and I could continue paying him 50¢ a ton until I paid back the $3300 to him, at which time the 50¢ a ton would not be deducted but he would pay me the full contract price. A little later, about the time I finished a sewer job in Anniston I was heavily involved and I told Mr. Huffstutler about it and told him I didn't know what the bonding company was going to do and if they did act what effect it would have on the mining operation and equipment. He said he would find out from the bonding company himself if he could, but sometime later I was in his office and he had drawn up a bill of sale on the equipment that I had on this work and he said he thought it would be a good idea to execute the bill of sale so that in case the bonding company did do anything about pinching me and it affected this operation we could hold that equipment out.

"Q. In other words, that was a bill of sale covering your property? A. Yes, sir.

"Q. That was down there on that job? A. That's right.

"Q. Did you execute a bill of sale? A. No, I didn't execute it.

"Q. In whose favor was that bill of sale drawn? A. General Ore Company.

"Q. Drawn to the General Ore Company? A. Yes, sir.

"Q. What became of that bill of sale? A. I destroyed it.

"Q. And you say you never did sign it? A. No, sir.

"Q. It was prepared in his office in Birmingham, is that correct? A. Yes, sir.

"Q. Just go ahead with these operations down here now. A. I continued the operations until this $3300 had been deducted on that 50¢ basis and I still wasn't making any money, I was still sinking money, and I undertook to make an agreement with Huffstutler to go into it on a 50-50 basis, that is, I furnish the equipment that I had on the job and he furnish the equipment he had on the job and we each take out so much a ton for our personal services and split the difference.

"Q. What were his personal services in connection with that operation? A. He handled the sales.

"Q. He handled the sales and you handled the production? A. Yes, sir. And from then on he handled the sales, they were handled in my name but he handled the accounts and paid out the money for the payrolls, but we never did close that deal. We kept trying to close it but we never did get it finally closed.

"Q. Did you finally cease operations down there on the Vinson place? A. After he took it over, or after he commenced doing all the financing, he had them move to another deposit but it didn't turn out so well and they moved back to the Vinson property and continued operations there for sometime, I don't know just how long. I didn't have anything further to do with it after about June of 1944, and after we couldn't reach any kind of agreement at all on handling it I told him I would have to quit because there wasn't anything I could do, and I came down and got some of my equipment."

With reference to this transaction and his appearance before the grand jury, the appellant testified:

"A. Several months went by and I received a long distance call from I believe Mr. Mitchell who is owner or president of Eufaula Hardware Company who wanted to know if he could get payment on a long past due bill of several hundred dollars due from General Ore Company. I told him we had no record of General Ore Company having any bill with him and he said, Well, it's on Mr. Edge, he and his employees had been buying material and charging it to General Ore Company. I told him that Mr. Edge had a contract as an independent contractor and had no authority to charge things to us but I would take the matter up with Mr. Edge. Along about that time I had several other calls and some letters came into the office and said they had sent us statement after statement and we had paid no attention to them. I learned that the statements had gone to our postoffice box which Mr. Edge used in Eufaula, and we did not get them in the Birmingham office. That's why we didn't know anything about them. I got in touch with Mr. Edge and took the matter up with him about charging all this material to General Ore Company, and he said he had been expecting a check to come in from a job that he was doing or had done over in Anniston of several thousand dollars and it would be in in a day or two and he would take care of it. Well, it didn't come apparently because he came back then and said he couldn't pay them and we would have to do something about it. I told him he had no authority to charge them to our account at all. Of course, he realized that but he gave me the excuse of he just carried it on since the accounts were in General Ore Company's name and we had established credit here and he didn't have any credit in Eufaula, so he was just charging to us. Well, the company didn't have any hold back. We had paid him every dime that was due him. So we made an agreement to this effect: That General Ore Company would pay off the bills under his agreement that he would give us a bill of sale on certain equipment that he had on the job and also over at Gadsden for the thirty-two hundred and whatever dollars it was, but when he got the money on this other job or from whatever source he was going to get the money he wanted the right within a reasonable length of time to pay us that money back and take his equipment back, and I agreed to that, but the bill of sale was supposed to have been made to us. We drew the bill of sale. He checked it over. He approved it in my office. I asked him to sign it. He said, As a matter of form I would like for my lawyer to check it over and I will sign it and mail it to you. Mr. Edge never mailed the bill of sale to us, even though I asked him about it. He was going from Ensley to Gadsden, to Anniston, to Eufaula, and Plantersville, and all over the place, and it was always some place else. We paid all those bills.

"Q. That was in October? A. October 7, 1943, We didn't pay all the bills at one time because the company couldn't take that much money out of operating expenses to pay them, so we made arrangements with the creditors to pay some of them so much a week, some $50 a week and some others various amounts, and as we paid those accounts we wrote Mr. Edge a letter and said, Under our agreement of October 7th, we paid the following accounts, and listed the accounts that we had paid, until we finally paid all the accounts. Then we notified him that we were happy to tell him we had finally paid all the accounts."

"Q. Then when he left there the first of May, the equipment which he had agreed you say to be transferred to you, or rather to the General Ore Company, what became of that equipment? A. We had already transferred that equipment on December 31 of that year when he didn't pay the $3,000 he promised to, over into our equipment account, General Ore Company's equipment account.

"Q. And you kept the equipment there? A. We kept the equipment, yes, sir.

"Q. Did you do any further operations, any further mining operations after Mr. Edge left? A. Yes, sir.

"Q. You continued to use that same equipment? A. Yes, sir.

"Q. Then what happened subsequent to that time? A. On the morning of July 10, which was on a Monday morning I received a call from Mr. W. H. Pattie, who

was superintendent of the operations,—he had been Mr. Edge's superintendent and we had kept him on the job,—and he told me that Mr. Edge had come down and taken all the essential equipment off and just simply demoralized the whole job and I had better come down right away.

"Q. That was on July 10, on a Monday? A. Yes, sir.

"Q. And it had been the day before? A. He said it had been loaded the day before but they had pulled out early Monday morning."

"Q. Omitting all of the things that took place except coming down here to Clayton and this proceeding down here, what did you do in reference to Mr. Edge's actions so far as Barbour County is concerned? A. I came down and talked to Mr. Borders, the Circuit Solicitor.

"Q. Did you state the facts to Mr. Borders substantially as what you have said? A. Yes, sir.

"Q. And you went before the Grand Jury and stated the case there? A. Yes, sir.

"Q. And Mr. Edge was indicted by the Grand Jury? A. Yes, sir.

"Q. And did you appear before the Court when he was tried? A. Yes, sir.

"Q. What occasioned you to come down here? A. I got a subpoena.

"Q. You got a subpoena signed by the Clerk of this court ordering you to come at a certain time? A. Yes, sir.

"Q. And came in obedience to that subpoena? A. Yes, sir.

"Q. After you had talked to Mr. Borders about the case did you have any subpoena to appear before the Grand Jury? A. Yes, sir.

"Q. In other words, when you appeared before the Grand Jury and also when you appeared before the petit jury you appeared in obedience to a subpoena issued by the court? A. Yes, sir.

"Q. Mr. Edge was found not guilty and subsequently filed a suit against you for malicious prosecution? A. Yes, sir."

In pertinent parts the Solicitor of the Third Judicial Circuit testified:

"Q. I will ask you this: Before that Grand Jury what was Mr. Huffstutler's attitude in regard to being solicitous in or about the prosecution of that case, of the presentment of that case to the Grand Jury? A. I would say he was interested in seeing that there was an indictment returned.

"Q. After the Grand Jury did meet and between the meeting of the Grand Jury and the trial of Mr. Edge on that Indictment, I will ask you if you were in any kind of communication with Mr. Huffstutler? A. It is my recollection that he called from Birmingham to ascertain whether or not the Grand Jury had indicted him."

"Q. In reference to being solicitous about the case, in reference to the fact that you had informed him you didn't think you had a case or if you did it was a very weak case. A. By way of explanation of my conversation with him, I learned from either you or him that he had talked to you on several occasions before I became aware there was such a case pending, and from what you had told me I told him that it was a weak case in that the property alleged to have been taken was taken in the broad open daylight, which might negative a felonious intent, but from what he and the other witnesses said there would be a case unless it was concluded that the circumstances under which the property had been taken negatived that intent."

"Q. He asked you about his giving you the facts of the case. He didn't tell you that Mr. Edge owned that property, did he? A. He said he didn't.

"Q. He said he didn't So he gave you his version of the facts? A. He gave me what he insisted the facts were. That was previous to the time he testified under oath before the Grand Jury.

"Q. I will ask you, Mr. Borders, if, in substance, at about the time that the Grand Jury was investigating this case, whether or not he told you that if an indictment was returned and when the case came on for trial that he would have more witnesses and could make out a better case at that time than he did before the Grand Jury? A. I

got the impression for this reason, before he left he asked me my opinion as to whether or not there would be an indictment and I told him at that time I thought all of the witnesses on the docket had appeared and testified and that if the Grand Jury believed that testimony it would be sufficient if they so construed it to warrant an indictment, and then I got the impression in the event there was an indictment there would be other witnesses to make the case stronger."

It appears that among the property taken by the appellee were several sets of pump parts, an automobile tire, and some assorted hand tools. These articles, without dispute in the evidence, were the property of the appellant and were included within the indictment which was returned against the appellee and which was the basis of the instant malicious prosecution suit.

We have herein set out the evidence which in our view is pertinent to the issues in the case. Our original opinion is extended by the above.

Application for rehearing overruled.