194 So.2d 519

Clyde W. BLACKWELL

v.

Edward D. SEWALL.

1 Div. 380.

Supreme Court of Alabama.

Jan. 26, 1967.

Scott & Porter, Chatom, for appellant.

Adams, Gillmore & Adams, Grove Hill, for appellee.

HARWOOD, Justice.

Edward D. Sewall, suing by his guardian, Mavis C. Fincher, filed a bill against Clyde W. Blackwell and Jackson Bank & Trust Company seeking to have a deed executed by Sewall to Clyde W. Blackwell canceled on the ground that Sewall was mentally incompetent to complete such transaction or to convey his real estate.

The original bill was filed immediately after an abortive lunacy proceeding had been held in the Probate Court of Clarke County, to declare Sewall mentally incompetent. This lunacy proceeding was set aside for failure to notify Sewall of such proceeding, and another lunacy hearing was had in January 1964.

The Jackson Bank & Trust Company was named as a respondent in the present proceedings in that Blackwell had borrowed money from the bank to purchase the Sewall land and had given a mortgage on the land in question to secure the loan.

The respondent-appellant, Blackwell, filed his answer denying the essential allegations of the bill and also filed a cross-bill praying that his deed from Sewall be declared valid and that Sewall owned no further interest in the property.

The deed sought to be canceled was executed and delivered on 17 July 1963.

Innumerable witnesses were introduced by both sides in the hearing below resulting in a rather voluminous record. The cause was submitted to the court for final decree on the merits, on the pleadings, testimony taken orally in open court, depositions, and documentary evidence. Thereafter the court entered a decree to the effect that:

"The Court is satisfied from the evidence that on July 17, 1963, Edward D. Sewall did not have sufficient mental capacity to understand in a reasonable manner the nature and effect of the deed which he executed on that date, purporting to convey to Clyde W. Blackwell the lands described therein and in the bill of complaint, and that he was therefore mentally incapacitated to make such deed; the Court is further satisfied from the evidence that Clyde W. Blackwell was a nephew of Edward D. Sewall, had known him intimately throughout the lifetime of the said Clyde W. Blackwell, and that the said Clyde W. Blackwell therefore had notice of the mental incapacity of the said Edward D. Sewall; wherefore, the aforesaid conveyance should not be permitted to stand; * * *"

The court then ordered, adjudged, and decreed that the deed in question be canceled, annuled, and set aside.

The evidence presented by the complainant-appellee in the proceedings below tends

to show that Edward D. Sewall, whose nickname is "Dime" was at the time of the proceedings below about 74 years of age. Edward had two bachelor brothers, Louis and Toy, and after the death of their parents many years ago, the three brothers lived together. Edward was crippled to some extent and under the appellee's evidence seems to have been childish and to an extent mentally deficient. During all of his adult life his two brothers looked after him and upon the death of Louis, his brother Toy continued this arrangement until his death in 1961. Under the testimony of appellee's witnesses, Edward never transacted any business for himself, and relied entirely upon his brothers who purchased his clothes for him and all of his other needs and sought to protect him in every manner.

After Toy's death in 1961, Edward slept in the Sewall home for two or three weeks but took his meals and spent most of his time in the home of his sister, Mrs. Clements, who lived two or three hundred yards distant. After two or three weeks he moved over to the home of Mrs. Clements and remained there until Mrs. Clements' death in 1963. It appears that Mrs. Clements looked after and cared for Edward until her death.

Clyde Blackwell was a nephew of Edward, and had known him intimately all of his life. Blackwell testified that after the death of Toy Sewall, Edward had approached him three times with a proposal that Blackwell buy his property and look after him. However, at the previous hearing Blackwell had testified that it was he who proposed the purchase, and that Edward had told him he would study about it and let him know. He also testified at this previous hearing that he had told Edward he would come over and live with him and that he had moved in with Edward and was living with him at the time of the previous hearing. In his testimony in the trial below Blackwell stated he did not agree

to move in with Edward and had not done so.

Blackwell testified that Edward later asked him what he would pay for the property and Blackwell told him he would pay him $10,000.

In July 1963, Blackwell brought Edward to Grove Hill and employed Mr. W. Johnson McCall, a practicing attorney, to prepare and supervise the execution of a deed by Edward conveying to Blackwell all of Edward's land. In this connection Mr. McCall testified that in his opinion Edward knew what he was doing, and he considered him of sound mind, though this was his first contact with Edward. Mr. McCall was not informed of the consideration for the deed, nor how it would be paid.

After the deed had been executed Blackwell took Edward to the Jackson Bank & Trust Company where Blackwell had arranged to borrow the $10,000 purchase price. Edward, being crippled, did not go in the bank but remained outside in an automobile. Blackwell told Mr. Nichols, president of the bank, that Edward wanted to deposit the $10,000 in a joint account in the name of Edward Sewall and Clyde Blackwell and also wanted to transfer into the joint account some $9,000 that was in a checking account in Edward's name. Mr. Nichols prepared the necessary papers and Blackwell took them out to the automobile where Edward signed them. Thus $16,000 was placed in a joint savings account in the name of Edward Sewall and Clyde Blackwell, and $3,000 placed in a joint checking account of Sewall and Blackwell.

According to Mavis C. Fincher, who was later appointed guardian for Edward, she and her husband went to the home of her mother, Mrs. Clements, to spend a weekend in November 1963. According to Mrs. Fincher, the following took place:

"A * * * after I entered the house Dime walked up and came in. His personal appearance at that time was as bad

as I have ever seen him look. He has a habit of picking his fingers, and he was constantly picking his fingers. I asked him how he felt and he says, 'I ain't no good.' I said, 'What's wrong?' And he says, 'I don't have a place to live.' I further questioned him and I said, 'What do you mean you don't have a place to live?' And he says, 'Well, they got my property.' I said, 'Who is they?' And he didn't say anything for several minutes. He moved over closer to me and he said, 'I wish I had not done this.' I said, 'What are you talking about, Dime?' He said, 'Buster and Dixie got my property.

"Q Who is Buster?

"A Buster is Clyde Blackwell.

"Q Who is Dixie?

"A Dixie is Clyde's father.

"Q All right, go ahead.

"A He then told me that they talked him into it and he says, 'I am going to have to do something.' I said, 'What do you mean you have got to do something?' He said, 'Well * * *' one of his common phrases is 'I Gannies'—now you can figure that out, I can't. He says, 'I Gannies I can't stay up there any longer.' I said, 'Do you want some help?' He said, 'Yes.' I said, 'Do you want your property back?' He said, 'Yes.' I said, 'What about your money?' He says, 'I ain't got no money.' I asked him about the money. He was very vague in his reply. I gathered from what he said, he pulled his bill fold out, and to Dime that is all the money he has is what he has on his person. He didn't seem to realize that he had any money other than what he had in his possession."

At Edward's request Mrs. Fincher accompanied Edward to the office of Mr. John Adams, an attorney in Grove Hill. Mr. Adams accepted a check from Edward for $100.00 as a retainer. Mr. Adams prepared for Edward's signature, and mailed to the bank, an instrument directing the bank to restore the savings account to Edward Sewall's name alone. He also wrote Blackwell a letter requesting that he confer with him about the matter. Three or four days later Blackwell brought Edward to Mr. Adams' office where Blackwell informed Mr. Adams, with Edward's acquiescence, that he wanted the original deed to stand.

While in the hearing below Blackwell could not remember what conversation had been had in Mr. Adams' office in reference to Mr. Adams' pointing out to him that Edward could have authorized Blackwell to sign checks for him without making a joint account, with Blackwell being the owner of the deposits upon Edward's death. Nevertheless in the previous hearing to revoke the adjudication of lunacy, he had recalled that such facts had been pointed out to him.

After the conference in Mr. Adams' office, Blackwell then took Edward to the bank where Edward signed another document directing the bank to disregard the cancellation of the joint accounts and to again place the accounts in the joint names of Edward Sewall and Clyde Blackwell.

Thereafter Mr. Adams filed for Mrs. Fincher a proceeding for a lunacy inquisition upon Edward Sewall. While the sheriff certified service of papers upon Edward, actually no service was had. This was not discovered until after Edward had been adjudged non compos mentis on 6 December 1963. This decree was set aside and a new hearing set for 10 January 1964, of which Edward did have proper notice.

Blackwell engaged and paid Mr. McCall to appear in Edward's behalf and resisted the adjudication, and participated with Edward in the hearing. Edward was again adjudged a non compos mentis on 10 January 1964.

Blackwell then took Edward to Mobile on 6 February 1964, for an examination by a Dr. Claude L. Brown, a psychiatrist, and after an examination, Dr. Brown certified that Edward was of sound mind

With this certificate and different counsel, Blackwell filed a proceeding as next friend of Edward, to revoke the guardianship and lunacy proceedings and to have Edward adjudged of sound mind. The verdict and judgment in these proceedings were against the revocation, and this judgment was affirmed by this court. See Sewall v. Fincher, 277 Ala. 152, 167 So.2d 719.

In the proceedings below the complainant-appellee presented some dozen lay witnesses who had known Edward for some 20 years to over 50 years and had seen him frequently during this time. These witnesses testified to the effect that Edward possessed insufficient mental capacity to understand in a reasonable manner the nature and effect of his action in signing the deed. In addition to these lay witnesses, Dr. William H. Rudder testified that he had examined Edward on Thanksgiving day 1963, to determine his mental capability. It was his opinion based on that examination that Edward was mentally incompetent to transact business; that he possessed the mental age of about 10 years. On cross examination, Dr. Rudder testified that he did not think Edward was capable of looking after anything, and would be entirely at the mercy of whoever was selling to him, and it was his opinion his relative mental competence had not varied between the time he examined him and the prior July 17, when Edward had executed the deed. It was his opinion that Edward had a basic lack of intellectual capacity from birth.

Dr. Robert S. Bolling testified he had first seen Edward as a patient about six years prior to the trial, and he examined Edward again on the day prior to the trial. It was his opinion that Edward's mental condition was substantially the same and that it was his conclusion that Edward was not mentally competent to handle his own affairs and that it was unlikely that there was any appreciable change in his mental condition during the six months prior to his examination in 1963.

Dr. Charles E. May testified by deposition that he had known Edward Sewall for 15 years and that he had been his patient in 1950 and again since February 1963. It was Dr. May's opinion that during the time he saw Edward that while he was aware of what he was doing, it was questionable as to whether he realized the consequences of all aspects of serious business transactions, and that Edward did not possess sufficient mentality to resist the persuasion of someone in whom he had confidence.

The respondent-appellant likewise presented a number of lay witnesses who by association with Edward were competent to testify as to his mental condition, and who did testify that in their opinion Edward was of sound mind on the date of the execution of the deed.

For the appellant, Dr. Claude L. Brown, a specialist in psychiatry, testified by deposition that he had examined Edward in his office on 6 February 1964, and based upon this examination, it was his opinion that Edward was entirely competent and capable of transacting his own business.

Upon cross examination, Dr. Brown testified that he did not remember how much of his interview with Edward was in the presence of Mr. Blackwell though most of his examination was with Edward alone. When a hypothetical question was proposed to Dr. Brown relating to transactions with Blackwell in reference to the purchase of Edward's land, the opening of the joint accounts, etc., he testified that while such facts had not been disclosed to him, such facts did not imply any alteration in his views as to Edward's competence. "It indicates at least some sort of vacillation in somebody's views" and he "supposed in Edward's, though he did not know."

Dr. J. P. Mudd, Jr., a practicing physician, testified that he first saw Edward about December 1963, and again on 4 March 1964. On the first visit, he did not make a formal examination but had a long discus-

sion with Edward and formed some impressions, and had him come by at a separate time when he was able to see him without Blackwell being present. As a result of his contacts with Edward, Dr. Mudd stated that in his opinion Edward was competent to manage his business affairs. On cross examination, Dr. Mudd testified that Edward seemed trustful and on good terms with Blackwell and seemed to have faith and trust in Blackwell. In his opinion Edward would give a lot of weight and credence to whatever Blackwell said, and in his opinion it was possible that Blackwell could persuade Edward to enter into business transactions which may not have been wise for Edward.

In the proceedings below the appellant also offered a number of deeds to and from Edward, mortgages to Edward, and a mortgage foreclosure. Appellant also offered in evidence a petition by Inez Bullock, a niece of Edward, to be appointed as administratrix of the estate of Louis Sewall and Toy Sewall, in which petition Mrs. Bullock certified that Edward was of sound mind. It was also stipulated that Edward had been registered as a voter in Clarke County.

As to the account in the Jackson Bank & Trust Company, during the years prior to 1963, Mr. F. S. Nichols, president of the bank, testified that the transactions relating to this account had been handled by Edward's brothers, Louis and Toy, and that he had never seen Edward in the bank at any time prior to the time that Blackwell brought him to the bank to reestablish the joint account.

*Assignments of error 7 through 29:* Many of the witnesses presented by the appellee testified not only to the mental incapacity of Edward, but also gave opinion evidence as to the value of the land conveyed by Edward in the deed to Blackwell.

The above assignments pertain to the competency of various of these witnesses to give opinion testimony as to either the mental capacity of Edward, or the value of the land, or both.

We have carefully read and considered this entire record. Those witnesses testifying as to Edward's mental capacity to understand in a reasonable manner the effect of his acts had all known Edward for from 20 to 50 years, and had seen him frequently during their acquaintance. Each and every one testified that during their respective acquaintances with him they had never known Edward to transact any business on his own. Some of the witnesses gave more detailed examples of Edward's complete and childlike reliance upon his brothers Louis and Toy.

■ It appears to be the doctrine of our cases that whether a witness is qualified to deliver a non-expert opinion, favorable or unfavorable, upon the issue of mental capacity, is a question submitted to the sound discretion of the trial court, a discretion not reversible unless plainly erroneous. Wear v. Wear, 200 Ala. 345, 76 So. 111; Price v. Marshall, 255 Ala. 447, 52 So.2d 149; Haghart v. Cooley, 278 Ala. 354, 178 So.2d 266.

■ We hold that as to those assignments relating to the court's rulings relative to the competency of the lay witnesses to express an opinion as to Edward's mental capacity, no error to reversal resulted.

■ As to the witnesses who gave opinion as to the value of the land conveyed, a reading of the record shows that each witness testified as to his knowledge of the land, familiarity with land values in the area, and knowledge of the value of the land being testified about. No merit attaches to any of such assignments.

We note here that appellee's witnesses were of the opinion that the value of the land was $20,000, while the witnesses presented by appellant were of the opinion that the value of the land was $10,000.

■ *Assignment of error 47,* pertains to the action of the court in receiving in evi-

**366**

dence over appellant's objection a decree of the Probate Court of Clarke County appointing Mavis C. Fincher as guardian of Edward D. Sewall.

Counsel for appellant argues that since appellant had already admitted in his answer and cross-bill that Mrs. Fincher was the guardian of Edward, such document was introduced merely to emphasize that Edward was non compos mentis.

Regardless of the motive of opposing counsel in introducing the decree, the instrument was relative to show Mrs. Fincher's authority to bring this suit, and we know of no rule preventing the introduction of relative evidence even though such evidence has been stipulated if counsel sees fit to offer it, and the court sees fit to admit the same.

■ Further, the evidence now complained of related to undisputed matters and was therefore harmless. Huffstutler v. Edge, 35 Ala.App. 277, 47 So.2d 191.

■ *Assignment of error 45,* asserts error on the refusal of the court to sustain appellant's objection to the introduction of a copy of a judgment obtained against R. L. (Toy) Sewall and Louis Sewall by W. G. Bevil and Company.

The record shows that at the time the objection was interposed to the reception of this document, the court stated:

"I won't consider that as testimony. I will only consider what I consider to be legal testimony, and you'all can get me straight in your briefs. The law doesn't require the Court to rule on any evidence in an equity case, and he is only required to consider that which is legal, and I will give you'all an opportunity to call my attention to that."

The court did not thereafter make a ruling as to the admissibility of this document.

In this posture of the record, and in face of the Chancellor's statement that he would

not consider the document, we must presume that it was not considered. Section 372(1), Title 7, Code of Alabama 1940.

■ *Assignment of error 6,* asserts that the court erred "in permitting, over timely objection of the appellant, Dr. W. H. Rudder to testify that Edward D. Sewall was not competent to transact business at the time of the execution of the deed in question, after Dr. W. H. Rudder, the witness, had testified that it would be difficult to determine Edward D. Sewall's mental state prior to his examination * * *"

In brief counsel for appellant refers to page 80 of the record as reflecting this testimony. This page shows that what Dr. Rudder actually stated was:

"I don't think * * * there is no question at all in my mind that he is not capable of transacting business; certainly at that time, and in my opinion, he had never pretended to take care of his own business."

The latter part of Dr. Rudder's above statement was based upon what Edward had told him. Even though Dr. Rudder, prior to the above statement, had testified that not having seen Edward prior to his examination on Thanksgiving day, 1963, it would be difficult to determine his exact state at any given time, this seeming contradiction, if such it be, went merely to the weight to be accorded Dr. Rudder's testimony. Jones v. Bell, 201 Ala. 336, 77 So. 998; See also Ala. Digest, Vol. 18A, Trial, ☞14D(1) for innumerable additional authorities.

On cross examination Dr. Rudder testified unequivocally that in his opinion Edward had a mental capacity of not over a ten year old child, and "would be entirely at the mercy of whoever was selling it to him" and that mental competence does not in general vary from one month to the next, or one year to the next.

■ Mental competence, which according to Dr. Rudder, is in general unvarying,

at or about the time in question, is a material circumstance bearing upon the issues of a person's mental status at the time in question. Wear v. Wear, 200 Ala. 345, 76 So. 111.

We find no merit in assignment 6.

*Assignments of error 30 through 44, and 46:* These assignments raise the question of the sufficiency of the evidence to support the decree rendered, and the application of governing legal principles to the established facts.

■ The burden upon the complainant was to establish to the required degree that Edward did not have sufficient mental capacity to understand in a reasonable manner the nature and effect of his act in executing the deed. Spence v. Spence, 239 Ala. 480, 195 So. 717.

■ Because of long acquaintance and relationship to Edward, it can be reasonably inferred that Blackwell had notice of Edward's incapacity, if such existed. Spence v. Spence, supra. There is therefore no basis for the operation of Section 41, Title 9, Code of Alabama 1940.

■ All of the numerous witnesses, except Drs. Brown, May, and Mudd, testified orally before the court. The three medical witnesses testified by deposition. After reading this record we are clear to the conclusion that there was ample oral and material testimony tending to support the Chancellor's conclusions and decree. He saw and heard all of the witnesses except the three named medical witnesses, and observed their demeanor. Having this advantage, his conclusions will not be disturbed unless plainly and palpably contrary to the weight of the evidence. McBrayer v. Smith, 278 Ala. 247, 177 So. 571; Thompson v. Collier, 170 Ala. 469, 54 So. 493; Hackett v. Cash, 196 Ala. 403, 72 So. 52.

■ *Assignments of error 1, 2, 3, 4, and 5:* These assignments charge error as a result of the admission into evidence, over appellant's objection, of a certified copy of a decree of the Clarke County Probate Court, rendered on 10 January 1964, declaring Edward D. Sewall to be of unsound mind. This decree was rendered nearly six months after the execution of the deed by Edward on 17 July 1963.

Counsel for appellant argues that the admission of this decree was erroneous under the doctrine enunciated in Frederick v. Wilkins, 182 Ala. 343, 62 So. 518; Todd v. Ward, 201 Ala. 205, 77 So. 731, and W. T. Smith Lumber Co. v. Foshee, 277 Ala. 71, 167 So.2d 154. The doctrine of these cases is to the effect that an adjudication of insanity is conclusive of the mental status of a person as of the time of the adjudication, and not at a time prior to, or subsequent to, such adjudication.

Counsel for appellee contends that the above doctrine was enunciated in purely ex parte proceedings where the lunacy proceedings were clearly res inter alios' acta of prior or subsequent transactions by the person adjudicated of unsound mind; whereas in the present case the lunacy proceedings were not res inter alios acta as to Blackwell in that it was Blackwell who engaged and paid the attorney in the original lunacy proceedings, and who participated in resisting the adjudication, and who also engaged Drs. Brown and Mudd to examine Edward in the proceedings to set aside the adjudication of Edward's unsoundness of mind, and who appeared as next friend of Edward in the attempt to revoke the adjudication.

Be that as it may, in view of the abundance of other evidence tending to show Edward's mental incompetence at the time of the execution of the deed, and the expert medical evidence of appellee that Edward's mental incapacity resulted from mental deficiency which was unvarying, we cannot see that the appellant was probably injured in any substantial right by the admission of the decree of the Probate Court rendered in the lunacy proceedings. We are unwilling to cast reversal on the lower court

because of the ruling in this instance. Supreme Court Rule 45.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and MERRILL, JJ., concur.