279 So.2d 500

**Betty Idell CHRISMAN**

v.

**K. V. BROOKS, etc.**

**SC 73.**

Supreme Court of Alabama.

June 7, 1973.

Lusk & Lusk, Guntersville, Jenkins & Wallis, Birmingham, for appellant.

T. J. Carnes, Albertville, for appellee.

MERRILL, Justice.

This appeal is from a decree setting aside a deed from Millard Fillmore Nixon to his niece, Miss Betty I. Chrisman. The deed was executed on June 11, 1969 and Nixon died on June 30, 1969 at the age of eighty-four years. The complainant-appellee, K. V. Brooks, is his nephew and executor of Nixon's estate.

The bill of complaint, as amended, charged that at the time of the execution of the deed, the deceased did not have sufficient mental capacity to execute it, or, in the alternative, that the deed was procured by undue influence on the part of Miss Chrisman, the respondent, or again, in the alternative, that the deed was in effect a conveyance in trust or a constructive trust, and finally, that there was a failure of consideration for the deed. The prayer was that the deed be set aside. Practically all of the estate consisted of the property deeded to Miss Chrisman by Nixon.

We do not recall that any witness described Nixon as an eccentric, but we think the undisputed testimony concerning him when he was concededly mentally competent would support that terminology. Nixon had a college education and for years he had lived alone in Albertville near the main business district. For the last ten or fifteen years of his life, he had not been employed and lived off his social security and welfare payments. Even though his normal behavior was, in some respects, odd, there was no evidence of mental incompetency until after he underwent an operation in a Huntsville hospital. But according to complainant's witnesses, Nixon's physical and mental deterioration began at that time.

When he was dismissed from the hospital at Huntsville, his niece, Miss Chrisman, a registered nurse, who was fifty-nine years of age, when the trial was had in 1971, took him to her home in Birmingham for his recuperation. He was hospitalized in a Birmingham hospital for pneumonia in September, 1968, again for two weeks of

tests in April, 1969, and he was operated on for hernia in May, 1969. He was discharged in May and returned to the hospital on June 16, 1969, five days after he executed the deed and died of cancer of the pancreas on June 30, 1969.

We quote a part of the trial court's opinion:

"The court is of the opinion that no useful purpose would be served by discussion of all of the evidence. However, the court will briefly comment on one aspect of the evidence. The respondent introduced depositions of some doctors which strongly tended to support the proposition that Mr. Nixon was of sound mind during the time and at all times before the execution of the deed in question. However, complainant introduced records of hospitals made during Mr. Nixon's periods of hospitalizations both before and after the date of the deed in question. Some of these records were made by doctors who later gave the depositions which were introduced by the respondent. These hospital records were made at the time of the events referred to therein and by persons who, the court must presume, were at the time concerned only with the welfare of the patient. These records reveal the struggles of a man who over a period of time was very sick, both physically and mentally, and they seriously contradict and impeach the testimony of the respondent and her witnesses on the question of Mr. Nixon's mental capacity during the period in question. They also strongly support and corroborate the testimony of complainant and his witnesses on this issue. After a full and careful consideration of all of the evidence the court is of the opinion that complainant has sufficiently established a general or habitual state of unsoundness of mind on the part of Mr. Nixon for some time before the execution of the deed in question and the respondent has failed to reasonably satisfy the court that such execution occurred during a lucid interval.

"On the question of undue influence the court is reasonably satisfied from the evidence that a confidential relationship existed between Mr. Nixon and the respondent and that the respondent was the dominant party in that relationship. This raises a presumption of undue influence and places on the respondent the burden of repelling such presumption with competent and satisfactory evidence. This, in the opinion of the court, the respondent has failed to do."

To understand the reference to the hospital records which were in evidence, we quote a few entries from them. The following are some of the entries made during his hospitalization in 1968:

"9/8    Pt. is wild-trying to get off bed. Dr. Risman notified.

"9/9    Very restless. Arm restraints applied. Trying to bite, kick, and hit everyone.

"9/11    Pulled oxygen nasal prongs from nose.

"9/17    Appears in better spirits and more aware of his surroundings.

"9/20    Discharged vis wheelchair to put (in) car. Accompanied by aid and family."

In Dr. Risman's signed history and physical examination, he referred to Nixon as "an elderly white male acutely ill" and that "there was obviously mild senility."

When Nixon was admitted to the hospital on April 10, 1969, Dr. Risman described the patient as "a warm, elderly, senile white male"; and when he was discharged on April 29, 1969, Dr. Risman referred to him as a "senile white male" * * * "discharged with the following diagnosis; arteriosclerotic heart disease with auricular fibrillation (2) inguinal hernia left (3) gout (4) emphysema (5) bronchiectasis (6) abdominal pain of undetermined etiology, possible carcinoma of pancreas manifested only by abnormal chemical tests."

A few of the notations on the clinical records during this period of hospitalization are listed:

"4/12 Pt. was found trying to get up over side rails when nurse was making rounds.

"4/15 . . . he absolutely refuses to eat.

"4/21 Asking where he is and who brought him here. Appears to be very confused and suspicious of everyone.

"4/21 Pt. agitated, shaking, disoriented. Fights anyone who comes near. Refuses all food. Staggers when up. Nurse with Pt. constantly until niece arrived. Pt. continues to fight anyone who comes near. Won't lie down. (Given medication) help of orderly and 3 nurses.

"4/22 Pt. has been confused tonight.

"4/24 Pt. very belligerent. Has to be talked into taking medications.

"4/29 Awake. Continues to be restless. Took PJ bottoms off and trying to get out from under covers."

Many entries note the "confused" state of the patient. Nixon left the hospital on a stretcher accompanied by Miss Chrisman.

The next day, April 30, he was back in the hospital for a hernia operation and was discharged on May 4. The surgeon wrote of Nixon's previous hospitalization, "It was thought that abdominal pain was probably due to carcinoma of the body or tail of the pancreas."

Nixon remained at Miss Chrisman's home until June 16. It was in this interval that the deed was executed on June 11. A few notations from his final hospitalization read:

"6/18 Refusing to take medicine and everything. Resents waking so early. Fighting and cursing.

"6/21 Awake, very confused. Cursing and praying. Undressing self. Putting legs in air.

"6/22 Continues to be confused.

"6/23 Awake, crying."

Nixon underwent another operation on June 24 and between then and June 30, he seems to have known little except discomfort and pain.

Mr. Nixon's will, executed October 11, 1965, bequeathed any money to be divided between K. V. Brooks, Helen Schlinkert, Edna Vieth, B. I. Chrisman and Aurelia Ferris. He also provided that his real estate be divided among these same five people and James Cox and Delmer Jones, share and share alike.

The evidence as to competency and undue influence was in sharp conflict.

■ The burden was on the complainant to establish to the reasonable satisfaction of the trier of fact that Nixon did not have sufficient mental capacity to understand in a reasonable manner the nature and effect of his act in executing the deed. Complainant's evidence, if believed, met this burden. Blackwell v. Sewall, 280 Ala. 359, 194 So.2d 519; Spence v. Spence, 239 Ala. 480, 195 So. 717.

■ Where evidence is heard orally before the trial court, the finding of the court has the effect of a jury's verdict and will not be disturbed on appeal, unless plainly erroneous, whether in law or equity. And we must affirm the trial court's decree, if fairly supported by credible evidence under any reasonable aspect, regardless of what might be our view of the evidence. Patterson v. Brooks, 285 Ala. 349, 232 So.2d 598. This rule has been applied in the following recent cases where the deed was set aside because of the incompetency of the grantors, or undue influence or both: Skinner v. Todd, 283 Ala. 279, 215 So.2d 721; Blackwell v. Sewall, 280 Ala. 359, 194 So.2d 519; McBrayer v. Smith, 278 Ala. 247, 177 So.2d 571; Gilbreath v. Gilbreath, 278 Ala. 289, 177 So.2d 915; Mize v. Mize, 273 Ala. 369, 141 So.2d 200; Casey v. Krump, 263 Ala. 346, 82

So.2d 424; Payne v. Payne, 284 Ala. 699, 228 So.2d 15.

While the evidence is not without conflict on material questions, and that of the respondent would support a verdict or decree in her favor, yet we cannot say that the decree is plainly or palpably wrong and therefore we are not inclined to disturb the decree of the trial court. Moore v. Walker, 201 Ala. 629, 79 So. 191.

Under assignment 1, which charges that the court erred in overruling the demurrer to the amended bill of complaint, appellant argues that the allegations of mental incapacity and undue influence are insufficient. We think the averments of the bill are sufficient to raise the issue of the soundness of mind of the grantor and as a bill to cancel for undue influence. Cox v. Parker, 212 Ala. 35, 101 So. 657. In *Cox,* this court also said:

"The issues of undue influence and mental incapacity usually arise together. Both involve the state of mind of the donor or testator. The issue of unsoundness of mind in the execution of deeds rarely arises, except in connection with some question of undue influence. The issues are triable together in all will contests at law or in equity. The parties interested, as well as the trior of fact, may easily find the deed the result of one or the other, and not be able to decide clearly on which side of the shadowy border line between mental capacity and incapacity the case falls. Equity would furnish a very inadequate remedy, if, on averment and proof of all the elements of undue influence, such as confidential relations with dominating influence, accompanied with voluntary activity in the preparation and procurement of the deed, the complainant should be turned out of court, because it should at last appear the donor had, from sickness or otherwise, become incapable of making a deed. We hold that, upon averment and proof tending to support the main equity of the bill on the ground of undue influ-

ence, cumulative averments and proof of mental incapacity are allowable, and relief by cancellation is properly granted in either event. * * * "

Assignment 8 charges error in the overruling of an objection to a question designed to show that there was ill will among Nixon and his brothers and sisters when the will of Jim Nixon (Nixon's father) was contested by two of Nixon's brothers. The trial court first sustained the objection and after its attention was called to the fact that this being an equity case, the court would only consider relevant evidence, Tit. 7, § 372(1), the court overruled the objection, presumably leaving the parties where they were before the two objections of appellant were made. However, assuming without conceding that the trial court erred, it was harmless error because the appellant introduced, without objection, the entire file in the will dissent case about which the witness was being questioned and the file showed that the will of Jim Nixon had been contested and it resulted in a decision of "no will."

Prejudicial error may not be predicated upon the admission of evidence which has been admitted without objection or motion to exclude at some other stage of the trial. Turner v. Blanton, 277 Ala. 536, 173 So.2d 80; Harvey Ragland Co. v. Newton, 268 Ala. 192, 105 So.2d 110.

Assignment 9 charges error in the overruling of an objection. The record shows in part:

"Q Mr. Jones, during the time that Court has been in session this afternoon have you been in one of the witness rooms?

"A Yes, sir.

"MR. JENKINS: Your Honor, I'm going to object to this. * * * " ·

In the first place, there is no record of any ruling of the court. The objection was neither overruled nor sustained. Aft-

er a lengthy colloquy, the court said, "All right. Go ahead." Where the trial court in an equity case did not specially rule on the legality of evidence, the presumption exists that the trial judge considered only that which was relevant, material, competent and legal, and findings by the trial court must be upheld when there was legal evidence before him. Tit. 7, § 372(1), Code 1940; Dougherty v. Hood, 262 Ala. 311, 78 So.2d 324; Gibson v. Anderson, 265 Ala. 553, 92 So.2d 692. Secondly, what we stated in discussing assignment 8, as to Tit. 7, § 372(1), is also applicable here.

 Assignment 10 charges error in the overruling of objections to the introduction of complainant's Exhibit 1–X, which was a letter from the attending surgeon, Dr. Patton, to attorney (now Judge) Clark E. Johnson, Jr., in which the surgeon commented on Nixon's mentality. The sole objection was that Dr. Patton's letter had not been properly authenticated, but counsel for appellant did state to the court—"I will agree that it (the comment in the letter) is in direct conflict to the evidence he (Dr. Patton) gave on deposition." The deposition had been introduced into evidence by appellant.

Again, there is no record of any ruling of the court. And again, the presumption is that the court, under Tit. 7, § 372(1), considered "only such testimony and evidence as is relevant, material, competent and legal."

Moreover, the objection that Dr. Patton's letter was not authenticated was without merit. Judge Johnson testified that he had written the letter to Dr. Patton making the inquiry and that letter was received in evidence as Exhibit 1–W. Counsel for appellant stated to the court that no objection was made to that exhibit because "it has been properly proved by Judge Johnson." Then Judge Johnson stated that Exhibit 1–X was "a reply which I received from Dr. T. B. Patton."

Where letters are shown to have been received in the due course of mail and were on the letterhead of the alleged sender and were in response to letters previously written to the sender, the presumption is that the letters were written by the purported sender, or for him by someone authorized by him, which presumption continues until overcome by evidence to the contrary or by the purported sender. State v. Massey, 271 Ala. 397, 124 So.2d 462; Reliance Life Ins. Co. v. Russell, 208 Ala. 559, 94 So. 748; White v. Tolliver, 110 Ala. 300, 20 So. 97.

Affirmed.

HEFLIN, C. J., and HARWOOD, MADDOX and FAULKNER, JJ., concur.