On Rehearing Ex Mero Motu

PER CURIAM.
This court’s no-opinion order of January 22, 1999, affirming the judgment of the trial court, is withdrawn, and this opinion is substituted therefor.
This case involves the voidance of a deed.
The evidence in the record indicates the following facts: Lecil Guin and his wife, Inez, jointly owned, without right of sur-vivorship, 86 acres of land in Marion County, on which their home was situated. The couple had five children — Ann, Sandra, Mary, Donald, and Robert Dale. They also had seven grandchildren, including the appellant (sometimes referred to as Heath), who is the son of Robert Dale.
After 51 years of marriage, Lecil’s wife died on August 28, 1992. The couple apparently had wills providing that the survivor would receive all property owned by the other upon the other’s death. Upon the death of both parties, the property was to be divided equally among the five children.
After his mother’s death, Robert Dale immediately hired a lawyer to represent her estate. The lawyer sent a letter to the five children, explaining to them that, in the absence of a will, their father would inherit an undivided one-half interest in their mother’s real and personal property. The letter suggested that the children could avoid the trouble and expense of probating their mother’s will by executing quitclaim deeds transferring to their father any interest in their mother’s real and personal property. Each of the children executed deeds by December 15,1992.
Shortly thereafter, on December 26, 1992, Lecil executed a deed, transferring the entire 86 acres to Heath, reserving a life estate for himself. It is undisputed that there was no monetary consideration for the conveyance. All the deeds were recorded on December 28, 1992. All the children, except Robert Dale, testified that they did not know their father planned to deed the property to Heath and that, had they known, they would not have executed the deeds transferring their interests.
On January 29, 1997, following several years of grieving, illnesses, depression, and surgeries, Lecil sued his grandson, seeking to have the deed voided. In his complaint, Lecil contended that the deed was without consideration; that it rendered him a pauper; and that it was the product of undue influence, duress, fraud, and deceit. Lecil subsequently amended his complaint to add a claim that he had been incompetent at the time he executed the deed.
On February 25, 1998, following an ore tenus hearing, the trial court entered a judgment voiding the deed. On March 18, 1998, Heath filed a postjudgment motion for “reconsideration” or, in the alternative, for a new trial. We will treat that motion as a Rule 59(e), Ala. R. Civ. P., motion to alter, amend, or vacate the February 25, 1998, judgment.
*1166 On June 15, 1998 — 89 days after filing his postjudgment motion Heath filed a second motion — wherein he requested, for the first time, a hearing on the merits of his motions. The trial court did not rule on either of the motions.
Heath appealed. He filed his notice of appeal on July 20, 1998, within 42 days of the denial of his first postjudgment motion by operation of law. See Rule 59.1., Ala. R. Civ. P. This case is before this court pursuant to Ala.Code 1975, § 12-2-7(6).
At the outset, we would note that the trial court’s judgment does not disclose the grounds upon which it voided the deed. It is well settled, however, that when the trial court did not specify the grounds upon which it based its judgment, an appellate court is bound to affirm the judgment if there is any valid basis for it. Weaver v. Dan Jones Ford, Inc., 679 So.2d 1106 (Ala.Civ.App.1996).
The trial court heard the testimony of numerous witnesses, including Lech, his five children, and his grandson Heath. The testimony was not without dispute. Hence, this court must recognize the basis of the ore tenus presumption, namely, the trial court’s ability to hear and to observe the witnesses as they testify and to determine their credibility. H.J.B. v. P.W., 628 So.2d 753 (Ala.Civ.App.1993).
Suffice it to say that, having reviewed the record, we conclude that the evidence was sufficient to support a finding either that Lecil was incompetent when he executed the deed, or that the deed was the product of undue influence, or both. See Payne v. Payne, 284 Ala. 699, 228 So.2d 15 (1969); Skinner v. Todd, 283 Ala. 279, 215 So.2d 721 (1968); Blackwell v. Sewall, 280 Ala. 359, 194 So.2d 519 (1967); McBrayer v. Smith, 278 Ala. 247, 177 So.2d 571 (1965); Gilbreath v. Gilbreath, 278 Ala. 289, 177 So.2d 915 (1965); and Mize v. Mize, 273 Ala. 369, 141 So.2d 200 (1962);
Specifically, the evidence suggests that several days after his mother’s death, Robert Dale begin pressuring his father, Lecil, to deed the 86 acres to Heath. Robert Dale and Heath kept telling Lecil that, “Maw-maw” (Inez) had wanted Heath to have the property. Robert Dale and Heath took Lecil to a lawyer’s office on several occasions. It is interesting to note that Robert Dale paid the lawyer for preparing the deed from Lecil to Heath. Yet, he testified that he never approached his father regarding deeding the property to Heath.
Lecil testified that he signed the deed conveying the property to Heath, but that he really did not understand it because he was “not thinking straight.” Lecil explained that after his wife died he did not care about anything; that he did not care whether he lived or died; and that for several years he felt he was living in a dream. He attended church less frequently; he stopped leading prayers at church; he stopped reading the Bible; his children had to tell him what to do — to eat, to shave, and to bathe; and they had to attend to his needs — perform his cooking, his shopping, his ironing, pay his bills, etc.
All the children, except Robert Dale, described their father as “a zombie” — sitting, staring, and crying a lot. These children stated that at the time their father executed the deed, he could be talked into doing anything. In fact, it is undisputed that at the time of his wife’s death Lecil had three insurance policies. Less than one month later, Robert Dale convinced him to sign change-of-beneficiary forms, to make Robert Dale the beneficiary of the policies.
The evidence further indicates that before executing the deed, Lecil was taking several prescription drugs for depression, high cholesterol, digestive problems, heart problems, and anemia. Before his wife’s death and before executing the deed Lecil experienced blackout spells, which were caused from having an inadequate blood supply to the brain. Lecil had a pacemaker inserted in 1993, and in 1996 he under *1167 went open-heart surgery. Although at the time of the surgery Lecil had thought he was going to die, his health improved immensely (apparently because he began to receive more oxygen to the brain) and he realized that he had made a mistake by executing the deed. Lecil testified as follows:
“Q. At some point in your treatment and your illness, did you realize what you had done?
“A. Yes, sir, when I was [hospitalized at Winfield].
“Q. Well, what caused you to remember that?
[[Image here]]
“[A.] They carried me [to the hospital], I thought I was going to die. I asked Ann how long I was going to live, three or four hours. Then I commenced to getting better, and I got to studying about how my wife was, you know, about how she treated all of her grandchildren .... She treated them all just exactly alike, bought them a birthday present and paid the same amount. If she bought them a Christmas present she paid the same amount right there. She wouldn’t have picked out one and left the other six out in the cold.... Then I was thinking back ..., [and] all that went through my mind [was] that I had signed that thing and left my other grandchildren out of it.”
In other words, after regaining his mental faculties (from grieving and illnesses), Lecil realized the consequences of his actions: that he had conveyed his major asset to one grandson, while excluding his children and other grandchildren. The evidence suggests that Lech’s actions were a result of coercion on the part of his grandson Heath, as well as his son Robert Dale — both of whom the trial court more than likely determined to be dominant spirits. After being released from the hospital, Lech visited Heath and requested that Heath deed back the property. Heath refused and referred his grandfather to a lawyer.
In any event, since his open-heart surgery Lecil’s mental faculties have returned. He drives, attends church regularly, reads his Bible dahy, and takes care of himself. He does, however, currently suffer from an aneurysm in his aorta and will undergo surgery as soon as he completely regains his strength. Lech has extensive medical bills, a limited income, and few assets. The 86 acres upon which his home is situated was his major asset. His children, excluding Robert Dale, testified that their father needed the property to be able to meet future needs, e.g., to pay medical expenses.
In Groover v. Darden, 259 Ala. 607, 612, 68 So.2d 28, 33 (1953), our supreme court stated:
“A conveyance of land obtained for a grossly inadequate consideration by unfair advantage taken of great mental weakness, though not amounting to absolute incapacity of the grantor, will in equity be set aside on equitable terms when application therefor is made seasonably by the grantor, his representatives or heirs. Walling v. Thomas, 133 Ala. 426, 31 So. 982 [(1901)]. Gross inadequacy of consideration, when coupled with other facts strongly tending to show fraud or undue advantage, is a suspicious circumstance. Burke v. Taylor 94 Ala. 530, 10 So. 129 [(1891)].”
Based on the foregoing, we conclude that the trial court’s judgment voiding the deed is supported by the evidence.
Heath also argues that the trial court committed reversible error by not conducting a hearing concerning the merits of his postjudgment motions. In Gibert v. Gibert, 709 So.2d 1257, 1258-59 (Ala.Civ.App.1998), this court stated:
“Rule 59(g), Ala. R. Civ. P., provides that posttrial motions 'shall not be ruled upon until the parties have, had an opportunity to be heard thereon.’ A trial court errs by not granting a hearing when one has been requested pursuant *1168 to Rule 59(g); however, that error is not necessarily reversible error. Kitchens v. Maye, 623 So.2d 1082 (Ala.1993)
In Greene v. Thompson, 554 So.2d 376, 381 (Ala.1989), our supreme court stated:
“Harmless error occurs, within the context of a Rule 59(g) motion, where there is either no probable merit in the grounds asserted in the motion, or where the appellate court resolves the issues presented therein, as a matter of law, adversely to the movant, by application of the same objective standard of review as that applied in the trial court.”
As noted previously, the trial court entered its judgment on February 25, 1998. Heath filed a postjudgment motion on March 18, 1998. In his motion, he merely stated that the trial court’s February 25, 1998, judgment was contrary to the facts, contrary to the law, contrary to the weight of the evidence, and not supported by the evidence. In other words, he recited no facts and made no arguments regarding the merits of the case. Further, he did not request a hearing.
On June 15, 1998, which was 89 days after he had filed his first postjudgment motion, Heath filed a second motion, requesting, for the first time, a hearing on the merits of the motion. We will treat this second motion as an amendment to the first postjudgment motion. Such an amendment is admissible if it is filed within 30 days of the entry of the judgment. See Ex parte Cleveland Consolidated, Inc., 435 So.2d 1285 (Ala.1983). Heath filed his amended motion 89 days after the trial court had entered its judgment.
We have concluded that the evidence supplied sufficient grounds for voiding the deed. Applying the law, this court, like the trial court, has resolved the matter adversely to Heath. Hence, any error the trial court may have committed in not conducting a hearing on the “motion to reconsider” is harmless. Thompson, supra.
The judgment is affirmed.
ORDER OF JANUARY 22, 1999, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
ROBERTSON, P.J., and YATES and MONROE, JJ., concur.
CRAWLEY and THOMPSON, JJ., dissent.